**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re: | Chapter 11 |
| Yellow Cab Affiliation, Inc., | Case No. 15-09539 (CAD) |
| Debtor. | |

**DECLARATION OF GARY SAKATA IN SUPPORT OF THE
DEBTOR'S CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF**

I, **GARY SAKATA,** hereby declare, under penalty of perjury, as follows:

1. I am the secretary and treasurer of Yellow Cab Affiliation, Inc., an Illinois corporation ("**Yellow**" or the "**Debtor**"). I perform my duties out of the Debtor's headquarters located at 3351 West Addison Street, Chicago, Illinois 60618.

2. I have been the secretary and treasurer of Yellow since November 1, 2011. As an officer of the Debtor, I am responsible for overseeing Yellow's general accounting and financial planning. As such, I have developed substantial institutional knowledge regarding Yellow's finances, day-to-day operations, business affairs and books and records.

3. I am over the age of 18, competent to testify, and authorized to submit this declaration (the "**Declaration**") in support of the Debtor's chapter 11 petition and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "**First Day Motions**").[1]

4. On date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor is continuing to operate its business and manage its properties as a debtor in possession

---

[1] All capitalized terms used but otherwise not defined shall have the meanings set forth in the relevant First Day Motion.

1

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in this chapter 11 case.

5.     Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and the Debtor's advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.  I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

# I.
# BACKGROUND

## A.     Overview of the Debtor

6.     Licensed taxi affiliations, such as the Debtor, are companies formed and licensed by the City of Chicago to provide services to taxi medallion owners including (1) a uniform trade dress and colors, (2) uniform trademarks, (3) insurance, (4) dispatch system, (5) a Chicago business address, (6) a registered telephone number, and (7) a registered agent, among other services.

7.     Yellow is one such taxicab affiliation whose members operate a fleet of over 1,600 taxicabs which serve the general public in the City of Chicago.  Yellow is a licensee and sublicensor of the trademarks Yellow Cab and Yellow, as well as the trade dress and goodwill associated with the operation of the Yellow Cab taxi service.

8.     The Debtor and each of its members are parties to a "Taxicab Affiliation Agreement".  Pursuant to the Taxicab Affiliation Agreements, in exchange for weekly affiliation dues, the Debtor sublicenses its trademarks and trade dress to the members and provides certain

2

other services to its affiliates. These services include (i) radio dispatch services; (ii) cashier window services; (iii) assistance with securing cab-top and/or other exterior/interior taxicab advertising programs; (iv) assistance with securing insurance programs, including collision and comprehensive fire/theft damage insurance and workers' compensation insurance at additional cost; (v) services to qualified charge account customers; (v) services related to cab coupons, vouchers, and credit and debit cards as approved and designated by the affiliation and the City of Chicago; and (vi) the ability to process the aforementioned credit and debit cards with equipment provided by the affiliation.

9. Each affiliation member is responsible for providing the passenger vehicle, ensuring that the taxicab is affixed with a medallion in accordance Chapter 9 of the Chicago Municipal Code, and ensuring that each of the individual's operating the taxicab is properly licensed by the State of Illinois.

10. In order to facilitate Yellow's operations and to provide certain services required under the Taxicab Affiliation Agreement in a cost effective manner, Yellow and Taxi Affiliation Services, LLC, a Delaware limited liability company ("**TAS**") are each a party to that certain Services Agreement dated January 1, 2010, (the "**Services Agreement**") which is annually renewed. Pursuant to the Services Agreement, TAS provides a number of services to the Debtor in exchange for a monthly service fee, determined in part by the number of Yellow's affiliation members, and reimbursement of TAS's actual and direct out-of-pocket expenses. TAS provides personnel and systems to assist the Debtor with accounting and back-office functions, maintenance of books and records, IT support and services. TAS also provides the Debtor with cashier window services, assistance in purchasing and supplying radio and communication equipment to the affiliation members, assistance with securing advertising programs, assistance

3

with securing insurance programs, as well as a number of other services which facilitate Yellow's operations.

11. The Services Agreement allows the Debtor, among other things, to meet the needs of its customers and vendors efficiently in a cost-effective manner through the centralization of key administrative functions. Prior to the Petition Date, the Debtor and TAS reconciled their books and records with respect to administrative tasks referenced in the Services Agreement on an annual basis.

12. As of the Petition Date, TAS now invoices the Debtor on a weekly basis for the cost and expenses of the services provided to the Debtor pursuant to the Services Agreement. As the extent of the services provided to the Debtor are largely fixed, the weekly invoices from TAS are for a fixed sum. To account for any variable or unanticipated expenses borne by TAS for services provided to the Debtor, TAS and the Debtor performs a reconciliation on a monthly basis.

B.   **Prepetition Capital Structure**

13. The Debtor has general unsecured claims which include, among others, trade claims and litigation claims. The Debtor has no secured debt.

14. The Debtor is a wholly owned subsidiary of Yellow Group, LLC. People Mover Inc. and Yellow Cab Partners LLC, respectively hold a 55% and 45% interest in Yellow Group, LLC. The majority of the equity of People Mover Inc. is owned by Michael Levine and the membership interests of Yellow Cab Partners LLC are held by Patton Corrigan.

C.   **Events Leading to the Chapter 11 Filing**

15. The Debtor's business has been adversely affected by the rise of on-demand app-based private transportation networks, increased competition, and the public's increased use of public transportation networks. Additionally, the Debtor is a party in a number of civil actions in

which plaintiffs assert claims against the Debtor related to actions taken by, or accidents involving the Debtor's affiliation members.

16.    Late in the evening of March 17, 2015, a judgment of $25,949,291 was entered against the Debtor in the Circuit Court of Cook County (the "**Circuit Court**").  The judgment relates to an accident that occurred in 2005 involving a taxi cab which was not owned or operated by the Debtor and for which the Debtor disputed any liability.  Although the Debtor sought a short delay in the entry of judgment on the jury verdict for reasons of perfecting the trial record, the Circuit Court denied the request.  Immediately following entry of the judgment, the Debtor filed a post-trial motion seeking, among other things, entry of a judgment notwithstanding the verdict, a reduction of the damages award and a new trail based on judicial error.  Rather than allowing briefing on this motion, the court immediately heard argument and ruled, denying the motion, in part with prejudice, and in part without prejudice, on the evening of March 17, 2015.  Additionally, the Debtor's trial counsel attempted to obtain a short delay in the proceedings and any ancillary proceedings contemplated by the parties through consent of counsel for the plaintiffs and the trial court, but neither would consent to a brief delay.  To the contrary, the plaintiffs stated their intention to take immediate action to collect on its judgment, resulting in a seizure of the Debtor's bank accounts and other assets, which, if successful, would have forced an immediate shut down of the Debtor's business.  The Debtor believes that the trial judge made numerous reversible errors in permitting the case to proceed against the Debtor and by excluding evidence that would have fully exonerated the Debtor from liability and the Debtor intends to take appropriate action to appeal the decision. The Debtor is without sufficient resources with which to satisfy the judgment and in order to protect

5

its assets and preserve the Debtor's business for the benefit of its customers and other creditors, the Debtor file this chapter 11 case early in the morning of March 18, 2015.

17. As a result of the aforementioned increased competition in the for-hire transportation market, the on-going litigation against the Debtor, and the judgment entered by the Circuit Court, Yellow was forced to commence this chapter 11 case.

**D.    Purpose of the Chapter 11 Filing**

18. The judgment entered by the Circuit Court has, obviously, significantly impacted the Debtor's business. However, the Debtor's business has also been negatively impacted by recent changes in the industry, including among others, the rise of on-demand app-based private transportation networks as referenced above. Notwithstanding these challenges, as of the Petition Date the Debtor has adequate cash and other current assets to operate its business. The Debtor, therefore, believes it will benefit from the breathing space afforded by chapter 11 to stabilize its businesses and to implement a revised business plan. The Debtor intends to use the chapter 11 case to resolve the various claims that threaten the viability of the Debtor's business on a going-forward basis and to pursue any and all remedies or avenues of appeal available to the Debtor.

## II.
## FIRST DAY MOTIONS

19. Concurrently with the filing of the voluntary petition to commence this case, the Debtor will be filing a number of First Day Motions. The Debtor anticipates that the Bankruptcy Court will conduct a hearing after the commencement of the case (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

20. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of the case; (b) continuing the Debtor's operations during the case with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of the Debtor's other key constituencies. I have reviewed each of the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in these cases.

21. The First Day Motions are summarized below:

**A.   MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (A) AUTHORIZING THE CONTINUED USE OF EXISTING BUSINESS FORMS (B) WAIVING ANY REQUIREMENT FOR A SPECIFIC ACCOUNT FOR TAX PAYMENTS AND (C) GRANTING RELATED RELIEF**

22. Pursuant to the Guidelines, the Debtor opened a new debtor-in-possession bank account (the "**DIP Account**") to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

23. The DIP Account was opened with The Private Bank, an authorized depository by the United States Trustee. For the avoidance of doubt, the Debtor will deposit funds in and withdraw funds from the DIP Account, to effect the administration of this chapter 11 case.

24. In the ordinary course of business, the Debtor maintains pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials, and other business forms (collectively, the "**Business Forms**"). To minimize administrative expense and delay, the Debtor requests authority to continue to use existing Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's "Debtor-in-Possession" status.

7

**B. MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (A) AUTHORIZING DEBTOR TO PAY (I) PRIORITY PREPETITION EMPLOYEE OBLIGATIONS, AND (II) PREPETITION WITHHOLDING OBLIGATIONS, AND (B) DIRECTING BANKS TO HONOR RELATED TRANSFERS**

25. The Debtor employs approximately twenty five (25) employees (the "**Employees**"). Out of the total of twenty five (25) employees, approximately three (3) are part time workers, while twenty two (22) are full time workers. One (1) of the Employees is salaried and the remaining Employees are paid on hourly basis.

26. All Employees are paid wages and salary (collectively, the "**Wages and Salaries**") every Thursday of each week (the "**Payroll Date**") for the prior week's work. Payroll averages $12,500 in the aggregate, including Payroll Taxes (as defined below). Eleven (11) Employees are paid through electronic fund transfers, i.e. direct deposit. Fourteen (14) Employees are paid with paper checks.

27. The Debtor's last Payroll Date was March 19, 2015 for the prior weekly payroll, and the next Payroll Date is scheduled for March 26, 2015. The Debtor estimates that, as of the Petition Date, approximately $4,250 in Wages and Salaries have accrued and are owed to Employees, with no Employees owed in excess of $12,475.

28. Mesirow Financial and Stratex Partners ("MyFirstHR") process payroll for the Debtor. MyFirstHR deducts the gross payroll amount from the Debtor's account a few days before the Payroll Date. The Debtor pays MyFirstHR a total of approximately $550 per month on account of payroll administration and certain other payroll related services. MyFirstHR deducts the monthly fee directly from the Debtor's account. The Debtor estimates that there are no accrued and unpaid costs in connection with MyFirstHR.

29. The Debtor, as employer, is required by law to withhold federal, state and local taxes from Wages and Salaries for remittance to appropriate taxing authorities (the "**Employee**

8

Taxes"). In addition, the Debtor is required to pay, from its own funds, social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, (the "**Payroll Taxes**") and remit the same to the appropriate authorities (collectively, the "**Taxing Authorities**"). For permanent Employees, the Debtor pays Payroll Taxes to various Taxing Authorities in accordance with the Internal Revenue Code and applicable state law. The Debtor's average one-week total obligation for Payroll Taxes is approximately $1,300. The Debtor seeks authority to honor and process the prepetition obligations with respect to the Payroll Taxes.

30. Employees receive Vacation Days ("**Vacation**") based on their length of service. Vacation for each year accrues and expires on the anniversary date of the original hire. Employees receive (i) 10 days of Vacation after the first full year of service from the date of hire, (ii) 15 days of Vacation after 5 full years of service from the date of hire, and (iii) 20 days of Vacation after 10 full years of service from the date of hire, through retirement. Employees are not allowed to carry over any unused Vacation into the following 12 month period.

31. The Debtor also provides Employees with paid personal time off ("**PTO**") after 90 days of service from the date of hire (the "**Probation Period**"). PTO is calculated on a calendar year basis, prorated for each month of service. During an employee's initial year of employment, an employee earns four (4) hours of PTO for each month of service after the Probation Period. Thereafter, Employees receive twelve (12) hours of PTO on January 1 of each calendar year, and earn additional four (4) hours of PTO for each month of service. Employees are allowed to carry over and accumulate unused PTO up to a maximum of twenty (20) days.

9

32. PTO may be used for vacation, personal time, illness, or the like. Employees are not permitted to maintain negative Vacation or PTO. Accrued, unused Vacation and PTO are paid out upon separation from the company. As of the Petition Date, the Debtor estimates there is approximately $11,000 of accrued and unused Vacation and PTO outstanding.

33. In the ordinary course of business, and as is customary for companies of its size, the Debtor maintains various employee benefits and policies that provide its Employees with medical and dental insurance, and other benefits which are described in more detail below (collectively, the "**Employee Benefit Plans**"). Some of the Employee Benefit Plans are fully funded by the Debtor, and others are funded either partially or fully through contributions made by the Debtor.

   A.   *Medical, Dental and Vision Plans*

34. The Debtor offers its Employees a traditional health insurance plan (the "**Employee Health Plan**") administered by Blue Cross Blue Shield of Illinois ("**Blue Cross**"). The Employee Health Plan is partially funded by the Debtor and partially by the participating Employees themselves. With respect to the Employee Health Plan, TAS pays Blue Cross a monthly premium and the Debtor pays TAS it's pro rata share of the premium for the Debtor's Employees. The Debtor deducts from the participating Employees' paychecks their respective contributions.

35. In addition, the Debtor offers a dental plan (the "**Dental Plan**") and vision plan (the "**Vision Plan**") administered by Guardian (the "**Guardian**"). The Dental and Vision Plans are fully funded by the participating Employees themselves. With respect to the Dental and Vision Plans, TAS pays Guardian a monthly premium, and the Debtor pays TAS it's pro rata share of the premium for the Debtor's Employees. The Debtor deducts from the participating

10

Employees' paychecks their respective contributions. Employees are eligible to participate in the Employee Health Plan, the Dental Plan and the Vision Plan after the Probation Period.

   B. <u>*Basic Life Insurance*</u>

   36. The Debtor provides a basic life insurance benefit (the "**Basic Life Insurance**") of $50,000 for all full-time employees who participate in the Employee Health Plan, which includes an Accidental Death and Dismemberment benefit. The Basic Life Insurance is funded fully by the Debtor. As of the Petition Date, the Debtor estimates there is no accrued and unpaid cost for the Basic Life Insurance.

   C. <u>*Workers Compensation Insurance*</u>

   37. The Debtor provides workers' compensation insurance for its Employees at the statutorily required level (the "**Workers' Compensation Program**"), as part of the group policy maintained by TAS. The Workers' Compensation Program covers all Employees and is administered through a workers' compensation insurance policy with First Chicago Insurance Company. The Debtor pays its pro rata share for the Workers' Compensation Program for the Debtor's Employees. It is critical that the Debtor be permitted to continue its Workers' Compensation Program. Failure to maintain this insurance could result in the institution of administrative or legal proceedings against the Debtor and its officers and directors and an inability of the Debtor to continue as a going concern.

   D. <u>*Retirement Plan*</u>

   38. Employees are eligible to enroll in a 401(k) plan (the "**Retirement Plan**") at the beginning of every quarter of a year after the Probation Period. Employees may contribute to the Retirement Plan through salary deferrals. The Debtor does not make matching contributions. Employees are always 100% vested in their personal contributions and cannot forfeit the

contributions. The Retirement Plan is administered by Transamerica Retirement Solutions ("**Transamerica**"). The Debtor estimates the amount of accrued and unpaid costs for the administration of the Retirement Plan to be $1,500.

39. The Debtor does not maintain a formal policy regarding the reimbursement of business-related expenses. However, the Debtor reimburses Employees for certain ordinary course expenses incurred within the scope of the Employees' employment, including travel, mileage, parking, transportation, cell phone bills, and other miscellaneous expenses (collectively, the "**Business Expenses**"). All reimbursement requests must be submitted to Gary Sakata along with the receipts, and Business Expenses are paid in full as soon as is practicable after the reimbursement request is submitted. The Debtor estimates that there are no accrued and unpaid Business Expenses.

40. As part of the relief requested herein, the Debtor also seeks authorization to pay all Employee federal and state withholding and payroll-related taxes relating to prepetition periods, including, but not limited to, Social Security taxes, unemployment taxes, Medicare taxes, and garnishments, as well as all other withholdings such as contributions to savings, retirement or pension plans, insurance contributions, and charitable contributions, if any (collectively, the "**Withholding Obligations**"). As of the Petition Date, the Debtor estimates that the amount of accrued and outstanding Withholding Obligations was approximately $1,400.

**C. MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO MAINTAIN EXISTING INSURANCE POLICIES, PAY ALL POLICY PREMIUMS ARISING THEREUNDER, AND RENEW OR ENTER INTO NEW POLICIES**

41. In the ordinary course of the Debtor's business, the Debtor maintains several insurance policies (collectively, the "**Policies**"). The Policies are administered by third-party

insurance carriers and brokers (collectively, the "**Insurance Carriers**"). A list of the Policies is attached to the Insurance Motion as **Exhibit A**.

42. As required by law, and pursuant to affiliation agreements with its members, the Debtor provides its members with general commercial automobile liability coverage for all taxicabs ("**Taxis**") owned by Debtor's members. To provide this mandatory benefit to its members, the Debtor maintains three separate Policies ("**Auto Liability Policies**") with: (i) Transit General Insurance Company[2] ("**Transit General Policy**") that provides coverage for approximately 1370 Taxis; (ii) New York Marine and General Insurance Company ("**NY Marine Policy**") that provides coverage for approximately 240 Taxis, and (iii) First Chicago Insurance Company ("**First Chicago Policy**"), which provides insurance coverage for six (6) Taxis serving customers with disabilities.

43. The members are insureds under the Auto Liability Policies. The Debtor is named as the insured. The Debtor pays the premiums for the Auto Liability Policies from the monthly affiliation dues paid by its members. The yearly premium for (i) Transit General Policy is $4,240 per Taxi, subject to a retrospective adjustment, (ii) NY Marine Policy is $4,793 per Taxi, and (iii) First Chicago Policy is $6,400 per Taxi. Premiums with respect to the Transit General Policy are paid by TAS as part of the services that TAS provides to the Debtor pursuant to the Services Agreement. The premiums are paid daily, with weekend and holiday payments paid on the next business day. Premiums for the NY Marine Policy and the First Chicago Policy are generally paid by the Debtor on a monthly basis.

44. In addition, as required by law, the Debtor maintains a workers' compensation insurance program to provide its members with workers' compensation insurance coverage for

---

[2] Transit General Insurance Company is owned indirectly by Michael Levine and Patton Corrigan, who also indirectly own Yellow Group, LLC, which own 100% of equity interest of the Debtor.

claims arising from or related to their employment of individual drivers operating Taxis (the "**Taxi Workers' Compensation Program**"). The Taxi Workers' Compensation Program is administered primarily through workers' compensation insurance policy with First Chicago Insurance Company. On average, 85% of Debtor's members participate in the Taxi Workers' Compensation Program. The members that participate in the Taxi Workers' Compensation Program pay additional monthly affiliation dues, which the Debtor then uses to pay the premiums for the Workers' Compensation policy. The yearly premium for each Taxi participating in the Taxi Workers' Compensation Program is $1,420. Premiums with respect to the Taxi Workers' Compensation Program are generally paid by the Debtor on a monthly basis

45. Separately from the Auto Liability Policies and the Taxi Workers' Compensation Program, which provide coverage primarily for the Debtor's members, the Debtor is an additional named insured on several additional ancillary Policies ("**Ancillary Policies**") maintained by TAS, which provide coverage for, among other things, the general liability and casualty. Premiums for those Ancillary Policies are financed pursuant to premium financing agreement between TAS and First Insurance Funding.

46. The Policies are essential to the preservation of the Debtor's business, properties, and assets, and in many cases the insurance coverage is required by various regulations, laws, and contracts that govern the Debtor's business. Specifically, the Debtor is required by law and the affiliation agreements, to provide commercial auto liability coverage and Workers' Compensation Program to its members. The Debtor believes it is in the best interests of its estate to permit the Debtor to honor its obligations under its current Policies (including related brokers' fees). Allowing these policies to cancel would have severe effect on the Debtor's ability to

provide its members with mandatory insurance coverage, and in effect would jeopardize Debtor's ability to continue its operations.

47. It is imperative that the Debtor seeks the authority from the Court to pay any prepetition premiums related to the Policies to the extent that the Debtor might discover and determine, in its discretion, that such payment is necessary to avoid cancellation, default, alteration, lapse, or any form of impairment to the coverage, benefits, or proceeds provided under the Policies. Such authority is necessary to keep the Debtor's Policies in effect. Any undue delay in satisfying the Debtor's obligations under the Policies may lead to unintended and irreversible adverse consequences for the Debtor's coverage under the Policies.

48. If the Debtor is unable to continue making payments on the Policies, Insurance Carriers may be permitted to terminate certain of the Policies to recoup their losses. Furthermore, if the Debtor is unable to continue making payments on the Policies, Insurance Carriers may not allow the Debtor to renew these Policies at the current rates in the future. The Debtor would then be required to obtain replacement insurance on an expedited basis and at great cost to its estate.

49. Moreover, to the best of the Debtor's knowledge, the First Chicago Insurance Company is the only insurance carrier that offers workers' compensation insurance coverage to the businesses in the taxi industry operating in the Chicago metropolitan area. Thus, if the First Chicago Insurance Company terminated the policy, it would undercut Debtor's ability to continue its operations and would likely preclude successful reorganization. Finally, even if the Insurance Carriers were not permitted to terminate the Policies, any interruption of payments would have a severe adverse effect on the Debtor's ability to extend current Policies or acquire new insurance coverage in the future.

### III.
### CONCLUSION

50. The Debtor, therefore, believes it will benefit from the breathing space afforded by chapter 11 to stabilize their businesses and to implement a revised business plan. The Debtor also intends to use the chapter 11 case to resolve the various claims that threaten the viability of the Debtor's business on a going-forward basis. In the interim, through the Motions and Applications described above, the Debtor seeks to minimize certain adverse effects that these cases might otherwise have on their business, while honoring the spirit of the chapter 11 process.

51. For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

[Signature on next page]

Executed this 20th day of March, 2015 at Chicago, Illinois.

                                        Yellow Cab Affiliation, Inc.,

                              By: _____
                                        Gary Sakata
                                        Secretary and Treasurer