



▶ **Yellow Cab Affiliation LLC**

## Report of the Examiner

December 7, 2015



## ▶ Preface

This report has been prepared by the Examiner appointed in the case In Re: Yellow Cab Affiliation, Inc. ("YCA" or the "Company") filed in the United States Bankruptcy Court, Northern District of Illinois (Case No. 15-09539).  It was prepared in conjunction with MorrisAnderson ("MA") in its capacity as a financial advisor.  It should not be used for any other purposes or distributed to any other parties.

The material presented in this Report is based on information provided by the Company and from independent research.  The Examiner and MA has sought to use reasonable care in compiling this Report; however, the Examiner and MA do not make representations or warranties with respect to the accuracy or completeness of the material provided by the Company contained in this Report.

This Report is provided only for the limited purpose for which it was commissioned.  Neither this Report nor any of its contents may be utilized for any other purposes and no reproduction or dissemination of this Report may be made without prior written consent of the Examiner or MA.

For further information, please contact:

MorrisAnderson, 55 West Monroe Street, Suite 2500, Chicago, IL 60603


Dan Dooley, Principal, 312.254.0888, ddooley@morrisanderson.com

Mark Iammartino, Managing Director, 312.254.0933, miammartino@morrisanderson.com



# Index

I. Executive Summary and Scope of Analysis

II. Industry Overview

III. Debtor's Organization

IV. TAS Operations

V. YCA Related Party Transactions

VI. YCA Financial Information

VII. TAS Financial Information

VIII. Reporting Issues and Claims

IX. Appendices

▶ Section I – Executive Summary





## ▶ Summary of Key Conclusions

- TAS manages and controls most aspects of YCA and three other affiliations

    - YCA can only be viewed comprehensively as part of the larger Yellow Group; it is reliant on TAS for a significant portion of its operations and would not be able to operate independently without substantial additional investment

- YCA is managed competently and no evidence of fund diversion has been discovered outside of Yellow Group

- Accounting process and records are completely intertwined at YCA, TAS and three other affiliations

    - Accounting is performed significantly after the fact due to shortages in skills, manpower and priority

    - Accounting transactions are very voluminous

    - Accounting balances for related party transactions contain numerous errors

- YCA has no practical ability to buy critical services elsewhere

    - Only option would be to buy dispatch, cashiering etc. from a competitor which is impractical

- YCA is not saleable except to a related party or to largest Chicago taxicab competitor Flash Cab

- Primary value in the taxicab industry is in medallions (right to operate taxicabs) and the financing of medallion purchases

- Accounting records were noted to be incomplete for 2015 and 4-5 months behind, which is unusually delinquent even for distressed companies, with additional necessary corrections yet to be identified and entered.  Bankruptcy reporting that relies on these records, even if already amended, will likely require further correction.



## Background of the Examiner Analysis

– Yellow Cab Affiliation, Inc. ("YCA") filed for Chapter 11 bankruptcy protection on March 18, 2015 in the Northern District of Illinois.  It is Case 15-09539 before Judge Carol A. Doyle.

– Scope covers two broad areas of inquiry including the investigation of any and all relationships and transactions between the Debtor and affiliated entities and the structure of the overall business enterprise with the affiliated entities

– A copy of the Order Appointing Examiner is attached as Appendix I.

# ▶ Section II – Industry Overview





# Organization of the Taxicab Industry in the City of Chicago

– All public passenger vehicles seeking to transport paying passengers is regulated by the City of Chicago pursuant to Chapter 9-112 of the Municipal Code of Chicago (the "Ordinance"), including taxicabs, livery vehicles and other charter services

– One of the most common and visible public passenger vehicles are taxicabs, which pick-up fares either through street hails or radio dispatch

– Taxicabs must be licensed by the City of Chicago in order to operate; evidence of the license is in the form of a metal medallion that is affixed to the front hood of the vehicle operating as a taxicab

– The City of Chicago controls the maximum number of taxicabs that may operate within the City limits by controlling the number of medallions issued, though medallions are saleable as described later in this report

– Medallion owners <u>must</u> join a licensed taxicab affiliation as stipulated by the Ordinance unless they are single-vehicle owner-operators

– Medallion owners also typically own the vehicles to which their medallion is affixed, but this is not absolute and some medallion owners may choose to lease their medallion to an independent vehicle owner so long as that individual is also the driver of the vehicle

– Taxicabs are leased to drivers for a fixed period of time; leases are standardized by regulation and are for either a daily or weekly 12 or 24 hour period.  The Ordinance also caps the amounts that medallion license holders can charge drivers



## ▶ Taxicab Drivers

- Taxicab drivers are frequently unrelated to the medallion or vehicle owner and instead lease their vehicles for a fixed period of time not less than 12 hours in a single day; most taxi drivers lease their vehicles by the week

- Most drivers are intended by YCA to be independent contractors that lease the medallion for purposes of operating a taxicab

- To operate a taxicab, drivers must hold a valid chauffeur's license issued by the City of Chicago, though affiliations may also impose additional requirements

- Taxi Affiliation Services Inc. ("TAS") issues a Universal or Restricted ID to drivers based on their validation of the driver's chauffeur's and driver's license and an evaluation of their motor vehicle record, and links it to their Social Security number.  All medallion owners that are members of YCA have Universal IDs.

- The ID is required before a driver may drive for any of the affiliations serviced by TAS, and must present their ID to the cashier prior to transacting business with TAS; the Universal ID has no relevancy outside of TAS but is acceptable for Yellow Cab, Checker, Blue Diamond and American United, while the Restricted ID is limited to a particular affiliation

- Based on YCA driver conversations, drivers deal with a single point of contact at the cashier window (described later) for all of their business needs without regard to underlying entity; many taxicab drivers either do not know or do not care they are transacting with multiple entities through TAS and consider it a single entity for operating purposes



## ▶ Medallion Owners

– Medallions are owned by a disparate group; many represent owner-operators though the majority are owned by a smaller number of large fleets or financial investors

– Medallions are leased to drivers in 12 or 24 hour shifts by the day or week; one of the primary measures of medallion profitability is utilization, representing the amount of time each week a medallion is leased

  • Anecdotally, medallion utilization is down sharply from several years ago, as both the number of medallions leased and the number of shifts leased has declined (i.e. vehicles may only be leased for 12 hours a day instead of 24, and remain idle for the unleased hours) due to competition for drivers from ride-sharing networks such as Uber and Lyft.

– Unless a medallion owner self-manages the license, any third-party entrusted to manage the license must be itself licensed as a medallion license manager, who shares joint and several liability for all obligations of the license owner

– Medallion managers provide services to medallion owners such as recruiting drivers, collecting payments, managing utilization and compliance with Ordinance

– Obligations of license owners includes all facets of compliance with the Ordinance, including operation of pre-approved vehicles, provision of approved taximeters, safety equipment, credit card terminals and other required services,

– Leases and lease rates offered to taxi drivers are standardized and promulgated by regulation; no lease terms outside of the Uniform Taxicab Lease Agreement are allowed and current maximum rates currently in effect are (ranges depend on vehicle fuel efficiency and age):

  • 12 hour daily leases range from $54-$72 per day

  • 24 hour daily leases range from $78-$99 per day

  • 12 hour weekly leases range from $363-$504 per week

  • 24 hour weekly leases range from $539-$693 per week



# ▶ Market for Taxicab Medallions

– Medallions are technically one-year licenses that are automatically renewed each year unless notified otherwise by the City of Chicago, but carry property rights and are transferrable by sale so long as the transfer is recorded with the City of Chicago and the relevant transfer tax is paid

– The market for taxicab medallions used to be robust and liquid but has largely dried up in the past 18-24 months due to the lack of financing and uncertainty regarding value due to increased competition from Uber, Lyft et al. and the uneven and changing regulatory burdens applied to ride-sharing networks and taxicabs

– Numerous news articles indicate there is no current financing market for taxicab medallions in Chicago; Capital One Bank used to be a large wholesale and direct lender to the market but withdrew in early 2014 and was sued by related parties to YCA including TAS and Transit Funding (Cook County Case 2015-L-005103)

– Data presented here was obtained from the City of Chicago website; includes non-commercial transactions between family members

– 1,001 medallions were transferred between Jan 1, 2012 and Jun 30, 2014; medallions owned by Michael Levine and Patton Corrigan represented a little more than half of these transfers





## Taxicab Affiliations

- Medallion owners <u>must</u> join a licensed taxicab affiliation as stipulated by the Ordinance unless they are single-vehicle owner-operators

- Affiliations are required to provide the following services:

  - Chicago business address, telephone number and authorized registered agent

  - Uniform color scheme and trade name or emblem approved by the City Commissioner

  - Approved two-way dispatch system

  - Liability insurance of at least $350,000 combined single limit coverage and workers compensation coverage

- As of April 21, 2015, the most recent data available from the City of Chicago, there were 23 licensed affiliations authorized to do business.  Three of these affiliations are owned subsidiaries of Yellow Group LLC, including the debtor, and one has common ownership as that of Yellow Group LLC:

  - Yellow Cab Affiliation Inc. (Debtor)

  - Blue Diamond Taxi Affiliation Inc.

  - Wolley Cab Association, Inc. d/b/a Checker Taxi Affiliation Inc.

  - American United Taxi Affiliation Inc. (common ownership)

- Affiliations, including YCA, do not own medallions though there is some overlap between the individual owners of entities owning medallions with those individuals that also own, either directly or indirectly, a taxicab affiliation



# Taxicab Affiliations (continued)

– No single taxicab affiliation is allowed to represent more than 25% of the total medallions issued by the City of Chicago; this rule and legacy consolidation has resulted in two large groups of affiliations representing the majority of taxicabs

- Yellow Cab, Checker Cab/Wolley Cab, Blue Diamond and American United are related; together they represent 33% of the market

- Flash Cab Co, 5 Star Taxi Association and Ace Cab Association are related and represent 13% of the market

- Market is fairly fragmented after consideration of the above two groups with the next largest affiliation representing only 7% of the market

– Medallion licensees may only change affiliation after notification to the City of Chicago, payment of a tax, and submission to vehicle inspection

– Changing affiliations for a small number of taxicabs would likely not be problematic, but changing affiliations for all taxicabs currently with YCA would likely present logistical issues to be resolved with the City of Chicago. The City of Chicago would not be able to immediately inspect all cabs nor would service providers likely be able to immediately repaint 1,500+ taxicabs

| Affiliation Relationship | No. | Pct. |
|---|---|---|
| Yellow Cab Affiliation | 1,584 | 23.8% |
| Checker Taxi Affiliation | 329 | 4.9% |
| American-United Cab Assn | 164 | 2.5% |
| Blue Diamond Taxi Affil | 116 | 1.7% |
| Subtotal | 2,193 | 32.9% |
| | | |
| Flash Cab Co. | 805 | 12.1% |
| 5 Star Taxi | 24 | 0.4% |
| Ace Cab Association | 10 | 0.2% |
| Subtotal | 839 | 12.6% |
| | | |
| Dispatch Taxi Affil | 489 | 7.3% |
| Royal 3 CCC Chicago Taxi Assoc | 455 | 6.8% |
| City Service Taxi Assoc | 424 | 6.4% |
| Globe Taxi Association Inc. | 417 | 6.3% |
| Independent | 120 | 1.8% |
| All Other Affiliations | 1,723 | 25.9% |
| Total Medallions | 6,660 | 100.0% |

▶ Section III – Debtor's Organization





## Organizational Structure – Debtor

- Yellow Cab Affiliation Inc. ("YCA") is a licensed taxicab affiliation in the City of Chicago and is a wholly-owned subsidiary of Yellow Group LLC ("Yellow Group")

- With nearly 1,600 cabs participating as members in the Yellow Cab affiliation, YCA is the largest affiliation in the City of Chicago and represents nearly 25% of the entire taxicab market

- As a member of the Yellow Group, YCA is one of four affiliations that are largely run as a group by the same management team with nearly identical organizational structures and operating procedures

- YCA's sole source of recurring revenue is affiliation dues and related late fees collected from medallion owners

  - Current dues are set at $195/week but some individual medallion owners are granted small discounts; standard rates were $181 in 2013 and $192 in 2014; total affiliation revenues were $14.0mm in 2014 and $15.3mm in 2015

  - Relationships with medallion owners are contractual but generally YCA allows members to leave the affiliation relatively easily.  Standard terms expire December 31st of each year, but if a medallion owner surrenders the license to the City, or otherwise asks to be released, YCA generally accommodates them.  See Appendix II for a sample agreement

- Primary expenses of YCA are liability and workers compensation expenses, a limited payroll, and general operating expenses, though most general operating expenses are incurred by TAS and reimbursed by YCA

- YCA outsources most of its daily back-office operations to TAS and is thus currently dependent on TAS for its day-to-day functions; YCA would need to establish most basic administrative functions of a company to operate independently



## Organizational Structure – Yellow Group, People Mover and Yellow Cab Partners

- Though Yellow Group has 18 direct subsidiaries and 10 indirect subsidiaries, Yellow Cab is primarily involved with or impacted by a smaller subset of these sister companies:

  - Blue Diamond Taxi Affiliation, Inc. ("Blue Diamond")

  - Wolley Cab Association  Inc. d/b/a Checker Taxi Affiliation Inc. ("Checker")

  - Taxi Affiliation Services LLC ("TAS")

  - Taxi Works LLC  ("Taxi Works")

  - Taxi Medallion Management LLC ("TMM")

- Yellow Group is owned by People Mover Inc. (55%) and Yellow Cab Partners LLC (45%), entities controlled by Michael Levine and Patton Corrigan, respectively.  Patton Corrigan owns 100% of Yellow Cab Partners LLC and Michael Levine owns 85% of People Mover Inc., with Jason Kahan owning the remaining 15%.  People Mover and Yellow Cab Partners also share ownership in a 54/46 split in American United Taxi Affiliation LLC ("American United")

  - Though not a subsidiary of Yellow Group, American United is treated very similarly by TAS to the three affiliations directly owned by Yellow Group

  - American United also owns a gas station with a car wash at which it provides TAS with a satellite cashiering location and free car washes to members of all four affiliations



# Organizational Structure – Related Parties

– Michael Levine and Patton Corrigan also own and control an unknown number of other entities, some of which are wholly unrelated to the taxicab industry, though several entities were identified as conducting business with YCA including:

– Transit Financial LLC, which is owned by Michael Levine and Patton Corrigan in equal 50% ownership stakes.  Transit Financial has the following wholly-owned subsidiaries:

- Gemini Claim Management LLC ("Gemini") – an insurance services company

- American Resources Insurance Agency LLC ("American Resources") – an insurance brokerage

- Transit General Insurance Company ("Transit General") – an insurance company, from which YCA purchases most of its liability insurance as described in further detail later in this report

– Entities owned or controlled by Michael Levine and Patton Corrigan that own at least 46 taxicab medallions

- At their peak, Levine and Corrigan owned or controlled approximately 588 taxicab medallions, but sold approximately 542 of them from 2012 through early 2014 and used the net proceeds to retire debt associated with the medallions.  See page 90 for further details

- Entities holding ownership in medallions appear to be two series of corporations organized in Illinois beginning YC1 etc. and CLMH 1 LLC etc.  Yellow Medallion Holdings and CL Medallion Holdings are organized in Delaware

- Current entities include YC1 LLC, YC 2 LLC, YC 17 LLC, YC 18 LLC, YC 19 LLC, YC 20 LLC, YC 21 LLC, YC 22 LLC, YC 25 LLC, YC 26 LLC and YC 56 LLC; these entities own 1-7 medallions each for a total of 46 medallions according to records obtained from the City of Chicago (current regulations cap the number of medallions per entity at 4, though certain entities were grandfathered when the regulation became effective)

– A full list of entities identified is attached as Appendix V



▶ Organizational Structure – Chart

Chart provided by
management





## ▶ Organizational Structure – YCA Corporate Formalities

– YCA is an independent company incorporated in Illinois and currently "Active" per the Secretary of State's office

– Board of Director meeting minutes were provided for the period 2013-2015 and appeared to be up to date

– Directors of YCA are Michael Levine and Evan Tessler, who is described as the in-house counsel for Yellow Group and is paid through the TAS payroll

– Officers of YCA are Michael Levine, Patton Corrigan and Gary Sakata

– YCA is located at 3351 W Addison St in Chicago, but does not have a lease for office space at that location, and there is no external or internal signage identifying YCA as an occupant of the building.

  • The building is owned by TMM Realty LLC, an entity separately owned by Michael Levine and Patton Corrigan

  • TAS and Taxi Works are the formal tenants, having entered into a joint lease, though the organization is in process of documenting formal leases for some of the other entities located on site like Second City Leasing; YCA pays rent only indirectly through the services agreement fees (2013 and prior) or through the cost allocation (2014 and later)

– YCA uses its own website and phone number for the receipt of dispatch calls (312-TAXICAB or 312-829-4222); the website and phone number are licensed from TAS through the services agreement (described later) and YCA does not own the website, phone number or colors; though YCA pays TAS for these items, TAS itself licenses them from Yellow Group.  TAS and Yellow Group have a license agreement that calls for a $60k annual payment, but payment has been waived to date

– YCA has one managerial employees outside of dispatch operations

– John Moberg and Gary Sakata's business cards indicate they are officers of TAS, but they also include the logos of all four affiliations serviced by TAS



## Organizational Structure – Related Party Corporate Formalities

- Individuals serving as officers and directors of YCA are Michael Levine, Evan Tessler, Patton Corrigan and Gary Sakata.  Along with John Moberg and Michael Francis, these individuals also serve as officers of other related entities as follows:

  - Taxi Affiliation Services, LLC: Michael Levine, John Moberg and Gary Sakata

  - Blue Diamond Taxi Association Inc.: John Moberg and Gary Sakata

  - Wolley Cab Association Inc.: Michael Levine, John Moberg and Gary Sakata

  - American United Taxi Affiliation Inc.: Michael Levine, John Moberg and Gary Sakata

  - Taxi Works, LLC: Michael Levine, John Moberg and Gary Sakata

  - Transit Financial LLC: Michael Levine, Patton Corrigan and Michael Francis

  - Transit General Insurance Company: Michael Francis and Scott Ruhl (per A.M. Best reports) but officers are Michael Levine, Patton Corrigan and Michael Francis (per management)

- Generally directors of the various entities are comprised of a portion of a group consisting of Michael Levine, Patton Corrigan, Evan Tessler and John Moberg



## Organizational Structure – Affiliate Descriptions

– All Chicago-based, TAS-serviced affiliations provide services sufficient to enable medallion owners to meet all City of Chicago requirements, with varying degrees of radio dispatch or brand names better known in particular neighborhoods

| Active Licenses at Oct 2015 | Weekly Rate | No. | Pct. |
|---|---|---|---|
| Yellow Cab Affiliation | $195 | 1,584 | 72.2% |
| Checker Taxi Affiliation | $188 | 329 | 15.0% |
| American-United Cab Association | $200 | 164 | 7.5% |
| Blue Diamond Taxi Affiliation | $148 | 116 | 5.3% |
| Total | | 2,193 | 100.0% |

– TAS also provides limited services to a group of companies known collectively as Metro Cabs, which are related entities that provide taxicabs to various suburbs and are heavily radio and airport dependent. The services are mostly in providing group health and other insurance coverage

– The affiliations listed above are all serviced by TAS under mirrored contractual agreements and with similar policies and procedures, though at different service agreement rates as described later in this report

– The four affiliations listed above are located in the same building and do not have independent signage or markings; the Metro Cab affiliations, serving suburban locations, are separately located in Schiller Park

– Affiliations have a limited number of employees each, generally restricted to dispatchers and dispatch supervisors. Further analysis of personnel is presented later in this report



## Organizational Structure – Service Provider Descriptions

- Taxi Affiliation Services LLC

  - Provides end-to-end servicing for taxicab affiliations, including YCA

  - Services are comprehensive including executive management, accounting and finance operations, treasury, human resources, and generally all services necessary to operate the company

  - Unaudited after 2012

- Taxi Works LLC

  - Provides garage services primarily to taxicab owners, with an emphasis on the initial conversion and maintenance of a vehicle into a taxicab through painting, installation of taximeters and video cameras, dispatch equipment and other technology required by Ordinance

  - Performs limited body work for taxicabs involved in accidents

  - Independently bills in its own name to vehicle owners and affiliations

  - No obligation for affiliation members to use Taxi Works, though many of them do for at least the initial conversion as the affiliation subsidizes the work at the rate of $225 per vehicle.  YCA also subsidizes the work performed at other approved, independent garages

  - Located on the same premises as the other entities of the Yellow Group, though it has its own signage in back

- Transit General Insurance Company

  - Underwrites taxicab liability policies on behalf of the four Chicago affiliations and generally handles most insurance matters for the affiliations; Transit General also writes taxicab policies on behalf of unrelated entities

  - Has been diversifying beyond taxicabs and provides insurance for other types of public passenger vehicles such as livery, charter bus and shuttles

  - Audited by Plante & Moran PLLC


MORRIS ANDERSON

## Organizational Structure – Payroll

| Entity | No. | Pct. | Weekly Pay (excl. taxes) | Annualized (excl. taxes) | Pct. |
|---|---|---|---|---|---|
| Taxi Affiliation Services | 55 | 54% | $ 45,900 | $ 2,386,806 | 62% |
| Wolley/Checker | 10 | 10% | 12,681 | 659,424 | 17% |
| Yellow Cab | 23 | 23% | 10,121 | 526,301 | 14% |
| American United | 10 | 10% | 4,124 | 214,447 | 6% |
| Blue Diamond | 4 | 4% | 1,515 | 78,764 | 2% |
| Total | 102 | 100% | 74,341 | 3,865,743 | 100% |

– Individual entities run their own payrolls, though the affiliations' employees generally only represent dispatch employees including supervisors

  • John Moberg is paid through the Checker payroll with his salary allocated back to other affiliations

  • Gary Sakata is paid through the TAS payroll

  • Patton Corrigan is paid through the American United payroll at an annual salary of $10k with the primary intent being to provide eligibility for health benefits; previously Corrigan also received management fees as discussed on page 87

  • Evan Tessler and Evelyn Figueroa, the group's attorney and paralegal, are paid through the TAS payroll and work on all taxicab related issues for the wider group

– Transit General mostly operates independently with its own employees and office location, with some support from John Moberg and Gary Sakata including accounting and general organizational support.  The level of support received from TAS has decreased over the prior 12-18 months

– TAS employed Hans Skillrud until October 2015 as the Director of Social Media at an annual salary of $50k; Hans Skillrud is also a part-owner of StickOutSocial, a general marketing company in which Patton Corrigan and Michael Levine were invested until Nov '15



## Organizational Structure – YCA Functions: Dispatch

– YCA maintains through a sublicense its own dispatch phone number (312-TAXICAB or 312-829-4222)

– Each affiliation including YCA maintains a separate payroll consisting of dispatchers and supervisors, with calls being assigned first to dispatchers on a particular affiliation's payroll before being assigned to other dispatchers

– Due to turnover and difficulty moving employees from one payroll to another, a mismatch between personnel and call volume has occurred over the years

  • YCA incurred approximately 34% of total dispatch payroll and benefit costs across all four affiliations in 2014, but generated approximately 75-80% of the total dispatch calls handled by the combined group

  • The assignment of a dispatcher to a particular affiliate's payroll does not reflect the origination of call volume that dispatcher will handle

  • Dispatch costs are later allocated based on dispatch call volumes, resulting in related party receivables and payables between entities



# Organizational Structure – YCA Functions: Cashiering

– Cashiering for both driver and medallion owner transactions are fully handled by TAS with all funds commingled into one bank account and later segregated by entity via journal entry, which may not be entered until month-end or several months later

– Since the petition date, TAS has begun transferring daily collections to YCA within two business days

– Transaction receipts are issued specifying what charges were paid; unless the full weekly amount due is collected for all obligations, TAS does not prioritize one entity's collections over another entity's and instead places the funds into a "savings" account pending receipt of the balance of the weekly payment; funds are thus not applied to any particular charge, including affiliation dues, and are only transmitted to the affiliation once the fully weekly amount is collected

– TAS performs cashiering for most entities within the wider organization besides YCA; payments are typically received for vehicle lease dues, affiliation dues, insurance payments, City of Chicago fines (which are paid by medallion license managers) and may be collected on behalf of numerous entities including YCA and the other affiliations, TMM on behalf of medallion owners, Transit General and other insurance providers, and Transit Funding for medallion loan payments, amongst others

– Drivers and medallion owners must post a cash bond to TAS to partially guarantee their obligations, including credit card chargebacks

  • This bond is held at TAS and is not allocated or dedicated to any particular entity on whose behalf TAS collects

  • These funds are not escrowed or segregated and are simply general obligations of TAS; no actual cash reserve is maintained at any banks

  • TAS has been flexible in collecting payments and has not immediately applied bonds to unpaid obligations due to the challenges facing medallion owners and drivers, thus obligations may exceed the bond amount posted

  • At June 30, 2015, the liability recorded by TAS for all bonds was approximately $1.1 million



# Organizational Structure – YCA Functions: Insurance and Payroll

- Insurance

  - Premiums due for liability and workers compensation coverage are paid directly by YCA

  - Management of the policies, such as modifying coverage or reconciling activity to member requests, is handled by TAS or Transit General; YCA has no employees that handle insurance matters

  - Prior to YCA's bankruptcy filing, the vast majority of cash disbursements made directly by YCA were related to insurance payments, representing 84.3% and 89.5% of all cash disbursements in 2013 and 2014, respectively. Other expenses were paid by TAS and recorded at YCA via intercompany journal entry.

  - Insurance bills are prepared on a monthly basis and list every vehicle being provided coverage

- Payroll and Management

  - As of October 16, 2015, YCA had 23 employees representing a total payroll of approximately $600k per year including taxes.  One employee was an affiliation manager of YCA and 22 employees were classified as dispatchers or supervisors in the dispatch department.

  - Tony Middleton is the affiliation manager of YCA and handles operational aspects of the affiliation

  - All back office and administrative functions are handled by TAS and paid by YCA through its services agreement with TAS, thus no employees performing those functions exist at YCA

  - Administrative operations including human resources, IT, accounting and treasury activities at YCA are handled exclusively by TAS



## Organizational Structure – YCA Functions: Accounting and Treasury

– Accounting and Finance

- YCA does not have a standalone accounting or treasury department; all accounting and treasury functions are performed by TAS

- No TAS individuals are designated as the YCA accountant or similar; workflow within the group is without regard to specific affiliations

- YCA has a standalone general ledger within the TAS systems in that it has its own company code

- TAS did not close general ledgers for YCA until November 2015 for periods through June 2015. TAS remains months behind in closing periods for July through October

– Treasury and Liquidity

- YCA is thinly capitalized and historically commingled its cash with the cash of certain other Yellow Group and related entities

- Prior to the bankruptcy, funds were only transferred into YCA in sufficient amounts to cover insurance and payroll disbursements; the general ledger balance of YCA's operating account was in a credit (negative) position at each month-end in 2013 and was generally below $20k at each month-end in 2014

- Subsequent to the bankruptcy, TAS began transferring daily cashiering payments received on behalf of YCA to YCA's bank account, with payments made to TAS on an as-available basis to cover operating disbursements at TAS

- Further discussion of the cost allocation and funds transfer methodology is discussed later in this report



# Organizational Structure – YCA Banking

- YCA used two primary operating accounts during 2015, one at MB Financial Bank and one at Private Bank

- Account at MB Financial Bank was the pre-bankruptcy operating account

  - Had an average daily balance of less than $70,000 during the period January 1, 2014 to March 17, 2015

  - Maximum balance during the same time period was approximately $658,000, though the account rarely held a balance greater than $100,000 on any given day

  - Higher than average balances were usually a result of timing from the transfer of funds from TAS to YCA pending further disbursement to Transit General or the insurance brokerage for workers compensation for payment of insurance premiums

  - Excess balances would be transferred back to TAS to cover TAS expenses such that the YCA account generally only had enough funds to cover miscellaneous direct disbursements from YCA

  - Activity stopped at time of bankruptcy filing except for bank fees with remaining balance transferred to the DIP account July 24, 2015 and account subsequently closed

- Account at Private Bank is the debtor-in-possession operating account

  - Had an average daily balance of approximately $187,000 during the period March 24, 2015 to October 7, 2015

  - Maximum balance during the same time period was approximately $503,000, with the account frequently holding an account balance of $200,000-$300,000.  Typical balance less than $50,000 during the previous month as the Debtor has been paying bills more timely

  - Receives daily transfer of funds from TAS for affiliate dues and other revenues, while it did not do so prior to bankruptcy

▶ Section IV – TAS Operations





## ▶ Overview of TAS

– TAS was intended to be a profit-generating entity servicing both owned and unrelated affiliations located in Chicago and nationwide

  • TAS recorded a net loss of $2.8 million in 2013, a net loss of $1.3 million in 2014 and a net loss of $107k for the first six months of 2015

  • Financial statements and related financial information presented here for 2015 should be considered preliminary because of accounting errors noted as discussed later in this report

– Since 2013, TAS has had three primary revenue streams:

  • Credit card processing fees earned from credit card services provided to taxicab drivers.  TAS collects gross credit card receipts and remits them to drivers at the cashier window upon presentment of receipts less a 5% processing fee.  The margin between processing fees and credit card processing costs was a positive $135k in 2013, a negative $149k in 2014 and a negative $71k for the first six months of 2015. The Ordinance lowers the cap on credit card processing fees to 4% effective January 1, 2016 and to 3% effective July 1, 2016.  This combined 40% reduction will likely have a serious adverse impact on TAS; the organization is exploring alternatives.

  • Service agreement fees paid by the individual affiliations designed to cover the costs of TAS operations; in April 2015 TAS elected to discontinue levying those fees from all the affiliations retroactive to the beginning of 2014.  In 2013, TAS recognized $4.7 million in service agreement revenue, and in 2014 TAS initially recognized $4.8 million before ultimately reversing the fees in April 2015. TAS has recognized $61k in service agreement fees from YCA in 2015 though this may represent an accounting error as TAS was not meant to be charging YCA a services fee in 2015

  • Allocation fees from related party taxicab entities operating in Baltimore, Transit General and Second City Leasing representing $521k for each of 2013 and 2014; the fees were intended to cover these entities usage of shared services but no allocation fees have been recorded by TAS through June 2015

  • These three revenue streams represented 94.0% and 95.6% of total TAS revenues in 2013 and 2014, respectively

– Operating costs for TAS are most significantly comprised of credit card processing fees; most other costs are now allocated to other entities – for the six months ended June 2015, credit card processing represented $2.2 million out of $2.3 million in total expenses recognized after allocations



## ▶ TAS Treasury Overview

– Treasury operates on a commingled basis across the four affiliations, TAS, TMM and Taxi Works, as well as TMM Realty, Transit Fuel (through American United) and appears to serve as a financing source for StickOutSocial, American Resources, and some of the medallion holding companies

– Combined operations are essentially run on a cash basis, with the accounting being recorded on a significant delay and oftentimes months subsequent to a cash transaction; cashiering records are maintained contemporaneously

– Individual entities have their own bank accounts but generally cash is concentrated at TAS; see Appendix III for a cash flowchart across the entire organization

– Gary Sakata, as CFO, has a strong treasury background and cash controls in the cashiering and disbursements process appear strong

– Transfers of cash are only made to affiliate and other related entity bank accounts when necessary, with any substantial balances maintained at TAS, though subsequent to the petition date TAS began transferring daily collections to YCA

  • Average daily cash balance in the TAS operating account was $693k for the period January 1, 2014 to October 7, 2015

  • The low balance was $188k and the high balance was $1.5 million

– All expenses that can be readily shared between entities are generally incurred and paid by TAS and expenses that can be directly attributable to a particular entity exclusively are incurred and paid by that entity with funds transferred from TAS

  • TAS allocated expenses at year-end 2013 and 2014 and June 2015 to the individual entities including YCA

  • Beginning in January 2015, TAS began allocating expenses on a monthly basis to YCA based on the prior year's allocation amounts converted to a daily rate with a true-up performed in November 2015 for the period through June 2015

  • See later slides for a more detailed description of the allocation methodology



## TAS Cashiering Overview

- TAS provides comprehensive cashiering services for a number of entities including the four affiliations, TMM, Transit Funding, Transit General and Taxi Works

- Drivers, medallion owners and license managers all pay obligations through the cashiering window; the organization is very heavily oriented towards cash payments, though most of the cash inflows are received via EFT from credit card processors

- Cashiering is a net user of cash in that it receives frequent deliveries of cash by armored car in order to pay out drivers against credit card receipts collected by TAS

- Cash handling appears to be tightly controlled with multiple sign-offs on transaction documents and individual cashier liability for unreconciled balances, with transfers of cash from the safe to the head cashier to the individual cashier all being recorded and reconciled daily

- Drivers and medallion owners are provided detailed receipts of their transaction upon completion of their cashiering visit

- If a medallion owner "short pays" his or her weekly obligations to the various entities on whose behalf TAS collects, TAS records the payment to a "savings" account, which represents an unallocated credit to their account.  TAS does not attempt to prioritize one entity's obligation over another, and does not apply the funds to a specific obligation until the full payment is received



## TAS Accounting Overview

–  TAS uses Microsoft Dynamics GP as its general ledger software, which is not well-suited for an organization with a large number of entities

–  Each entity within Yellow Group has its own independent company file; entities are not set-up as divisions or other segments of an overall company, except for TMM Realty LLC, which owns the building on Addison St. and is set-up as a division of TAS despite not being a unit of TAS

–  TAS does not appear to use any of the canned reports embedded in the software and instead relies primarily on data extracts imported to Excel for reporting purposes

   •  Heavy use of pivot tables enables management to drill down into specific account activity but does not provide data controls

   •  Many other Dynamics users install Management Reporter or other software to provide more robust data analytics and reporting modules; TAS previously used FRx but was unhappy with its implementation

–  No compiled financial statements are provided internally or were provided for purposes of this analysis; financial statements were solely provided in the form of Excel extracts that essentially represented a trial balance

–  Substantial intercompany activity is recorded, with a large number of receivable and payable accounts set-up within each company to record activity due to or from other related entities

–  Intercompany activity is generally recorded in arrears at month-end or year-end due to the high volume of transactions, resulting in significant reconciling differences that require investigation; a full analysis of intercompany balances was not able to be completed, but it was noted that intercompany receivables and payables did not balance for all entities at year-end 2014 or at June 2015

–  Significant account clean-up activity was noted to have been recorded each year to offset intercompany receivables and payables, to reclassify activity between accounts and between entities, and to correct errors; these correcting entries were significant in magnitude, thus making it difficult to accurately identify actual balances owed to individual entities

–  Balances owed are relatively meaningless in regards to the actual operations of the companies as they are commingled on a cash basis for all practical purposes; the general ledger accounting is not recorded concurrently with cash transactions



## TAS Accounting Overview

– There has been substantial turnover and workforce reductions in the accounting function during the prior 3 years, which has contributed to the high error rate and delinquency within the accounting records

- At the beginning of 2013 there were 8 FTE in the accounting department; two of those individuals were terminated in October 2013, 1 in November 2014 and 1 in April 2015

- A part-time person was hired in June 2013 and a full-time person was hired in June 2015

- The termination in April 2015 and hiring in June 2015 represented a change in the controller of the organization

- Department has shrunk from 8 FTE to 5.5 FTE in prior 2.5 years and has experienced significant turnover

- TAS hired a temp in August 2015 to assist in additional accounting responsibilities and for general catch-up

– Workflow is not assigned according to entity, and no specific individual is solely responsible for YCA

– Upon start of this assignment, TAS was approximately 6 months behind in finalizing bank account reconciliations and closing monthly ledgers, with the most recently fully closed period being February 2015

- As of the date of this report, TAS has mostly completed bank reconciliations through August 2015

- Financial statements were represented to be largely complete through June 2015 but remaining periods are still open

– Complexity of accounting and volume of transactions coupled with additional reporting requirements and accounting changes associated with the YCA bankruptcy have placed significant strains on the TAS organization that it has struggled to address

– TAS also previously did the accounting for Transit Financial, but because they were falling behind in required regulatory reporting, Transit Financial has assumed some of its own bookkeeping and hired a temporary staff to assist

– YCA was last audited for fiscal year 2012.  Subsequent to the payoff of the Capital One loan obligations, there were no further third-party audit requirements that might have resulted in the organization having corrected its records annually



## TAS Accounting Overview

– TAS created a separate company code for YCA DIP, but it does not appear to be a complete and accurate ledger:

- No equity accounts have been established

- Some activity appears to have been booked in YCA and not YCA DIP, and vice versa, though this appears to have been identified and corrected in November 2015

- No insurance expense entries were made subsequent to August 10, 2015, and this includes the related entry to the cash account in the general ledger

- No service agreement fees were made subsequent to July 2015, while no service agreement fees were recognized at all in the pre-petition company

- No intercompany receivable due from TAS was recorded yet for August or September 2015

- Numerous other accounts indicate accounting has not been maintained on an up-to-date basis

– TAS is running 3-6 months behind in recording and reconciling accounting data

– TAS is having significant difficulty providing accurate and timely accounting information for internal or bankruptcy court reporting purposes

– Given the large number of transactions occurring at the various entities that impact the intercompany balances with YCA, substantial additional effort would be necessary to fully validate the YCA-sided balances

▶ Section V – YCA Related Party Transactions





# Related Entities Doing Business Directly With YCA

- The majority of YCA's cash disbursements and expenses pertain to related parties, though significant third-party/unrelated transactions also exist

- Most significant disbursement relates to liability insurance, which is predominately covered through Transit General, though YCA also has some policies through First Chicago and New York Marine, which are independent third parties.  At November 15, 2015, approximately 90% of the taxicabs that were members of YCA were insured through Transit General (1,425 taxicabs)

- YCA primarily transacts with TAS, Taxi Works, Transit General and the other affiliations

- Third party relationships are with certain liability insurance providers including First Chicago (handicapped vehicles) and New York Marine (high risk pool), various insurance brokerages handling workers compensation policies, ADP for payroll services, and independent automotive repair shops

- Michael Levine and Patton Corrigan also own at least 46 medallions that are members of YCA; medallions are owned by a series of separate entities that have hired TMM to be its license manager and thus pay affiliation dues to YCA through TMM



## ▶ YCA Transactions with Taxi Works

- Taxi Works is located on-site and is dependent on business from the four affiliations, though it also serves taxicabs that are members of other, unrelated affiliations

- Medallion holders are responsible for installing required safety, credit card, and other equipment, and for painting the vehicles in accordance with affiliation standards; they are free to use whichever vendor they choose, but many choose to use Taxi Works

- YCA provides medallion holders an initial $225 towards the painting of the vehicle, though the medallion holder has the option of having the work done at Taxi Works or 10 other authorized, independent providers

- YCA makes cash payments to Taxi Works on a monthly basis though it has also periodically offset its payable to Taxi Works with a reduction in its payable to TAS, with TAS in turn reducing its receivable from Taxi Works

- Taxi Works does not perform any mechanical repair services as it is concerned about potential liability from imperfect repairs



## YCA Transactions with Taxi Medallion Management

- YCA paid service fees of $57,174 in 2013 and $56,700 in 2014 in exchange for TMM requiring certain of its vehicle owners to be members of YCA; no such fees have been recognized in 2015

- TMM is the licensed manager for 679 medallions, of which at least 46 are owned by Michael Levine and Patton Corrigan

- As the license manager, TMM is obligated to pay affiliation membership dues on behalf of its clients, including those dues owed to YCA, though YCA has contracted with TAS to collect all of its affiliation membership dues on its behalf including those collected from TMM

- Most of the detailed operational services are outsourced to either All City Taxi or M&A Leasing; these sub-managers handle the actual management of individual drivers and collection of weekly dues from drivers

- The sub-managers pay a fixed monthly fee to TMM for management of the licenses and in return keep any weekly lease rates collected from drivers in excess of the monthly fee paid

  - The fixed monthly fees are in turn paid to the medallion owners without discount and as essentially a pass-through, except for the medallions owned by Michael Levine and Patton Corrigan, who receive the management fees less $50 retained by TMM

  - Because the City collects fines and other taxes like the ground tax from the license managers, TMM also collects and passes through these receipts

- TMM directly collects some of its fees from the sub-managers or for other payments if not received in currency or commingled with other fees owed, such as affiliation fees; otherwise, payments are collected by the cashiers in TAS and recorded to the appropriate entities through their daily reconciliation process



## ▶ YCA Transactions with Taxi Medallion Management

- TMM directly collects some of its fees from the sub-managers but a majority of its receipts are collected by the cashiers in TAS and recorded to the appropriate entities through their daily reconciliation process

- TMM is the parent company of a series of 10 subsidiaries named TMM 1 LLC through TMM 10 LLC; these entities own vehicles that are leased to the sub-managers for use in operating their fleets; lease income may be earned on vehicles owned outright or under third-party lease

- TMM has approximately $1.8 million in bank debt with Allpoints, a subsidiary of Capital One, that was used to finance the purchase of the vehicles. Monthly debt service was approximately $91k as of November 2015 for 145 vehicles. The last vehicles added were in December 2013 and the number of financed vehicles will continually decline until the final loan payments are made in September 2017

- Because the Ordinance requires replacement of taxicabs after four years of service, management is very concerned regarding the ability of fleet owners to acquire or finance replacement vehicles in 2016 and beyond

- TMM has a net loss due to vehicle depreciation but is generally cash neutral otherwise; the intent is to slowly wind down TMM's activities since much of it is a pass-through and offers no benefit to the wider group

- Technically the lease manager has to provide credit cards, but they outsource this to TAS. With the coming reduction in maximum credit card processing fees, TAS is considering the possibility of exiting the credit card business; this would require medallion owners to find an alternative way to provide credit card capabilities to their cabs

- TMM leases some of the vehicles from Second City Leasing, who in turn financed them from Allpoints; certain leases called for Second City to subsidize the interest rate but the Examiner could not validate whether Second City has actually reimbursed TMM for the higher interest rates in recent years; no entries reflecting such reimbursement were noted in the TMM general ledger for the first half of 2015



# YCA Transactions with Transit General

- Transit General is a related party in that it is a wholly owned subsidiary of Transit Financial LLC, which itself is owned by Michael Levine and Patton Corrigan, who are the ultimate owners of Yellow Group LLC

- Transit General is a licensed insurance company regulated by the State of Illinois

- Approximately 90% of the commercial auto liability policies in place at November 2015 for the members of YCA is underwritten by Transit General, with the remaining policies underwritten by First Chicago Insurance Company and New York Marine and General Insurance Company

- YCA represents approximately 35%-40% of Transit General's overall risk pool based on premiums paid and has been declining as it seeks to further diversify away from YCA and taxicab policies in general

- Transit General currently charges YCA an annual policy premium of $4,200 per taxicab; at the time of renewal, YCA was quoted $4,750 from First Chicago, $5,900 from New York Marine and another broker indicated the premium would be above $5,000 by other insurance providers, and anecdotally newspaper accounts suggest the market rate for taxicab liability policies to be approximately $4,000-$5,000 per vehicle

- Transit General has a loss rate of 70.9% on commercial liability policies, which is substantially higher than the other providers; the insurer indicates this a function of its lower rates relative to the competition and does not adequately reflect the inherent risk involved in insuring taxicabs

- Transit General had positive earnings for YTD 2015 through June of $441k and total year earnings of $1.3 million in 2014

- Insurance rates paid by YCA appear to be at least consistent with the local market if not below market and do not represent a diversion of funds from YCA to Transit General



## ▶ YCA Transactions with TAS

- YCA has a written contract with TAS for the provision of back-office accounting, cashiering and other taxicab related services (the "Services Agreement"), which is attached as Appendix IV.

  - Contract is dated January 1, 2010 and automatically renews annually; TAS has provided notice it will not renew the contract and will instead move forward on a month-to-month basis

  - Signed by Daniel DeLeo on behalf of YCA and Timothy Murphy on behalf of TAS; these individuals were the prior CEO and CFO of both TAS and YCA and neither remain with TAS, YCA or the other related entities

- Contract calls for the payment of two items: the base and additional fee and the reimbursement of actual and direct out-of-pocket expenses, which may be reasonably allocated

- The base fee is $2,500 per month regardless of volume plus an additional fee of $45 per week for every member beyond 20 members, payable within 10 days after month-end

- Expenses are to be reimbursed "promptly on the … rendering of a statement" and are subject to a reconciliation and adjustment within 90 days after year-end; no such statements are prepared or submitted to YCA

– Historical practice has been to record charges and allocations between the two entities only via journal entry to intercompany due to/due from accounts, without the preparation of formal statements, and often substantially in arrears

– In April 2015, the Services Agreement was materially modified retroactively to January 1, 2014 to waive the collection and recognition of the base fee and additional fee, and to expand the scope of the expenses for which YCA would reimburse TAS; this modification was oral and not documented in contravention to the requirements of the Service Agreement that all modification be agreed to in writing.  Since the same individuals would execute any such modifications on behalf of both parties, this requirement seems to have little practical effect

– Nothing in the Services Agreement appears to prohibit the offset of amounts owing between YCA and TAS



## Comparison of YCA Rate to the Rate Charged to Other Affiliations

- All four of the affiliations operating in Chicago pay a base fee of $2,500 per month and a weekly charge for every affiliate member beyond 20; however, the weekly fee varies for each affiliate

- YCA, which due to its concentration of fleet owners has a significantly higher volume and complexity of transactions and driver turnover than the other affiliations that requires significantly more TAS involvement, and which must also license its usage of the Yellow Cab name and colors, pay a weekly fee of $45 per affiliate per week;

- Checker, which licenses its usage of the Checker name and colors from an independent corporation in Michigan at $10k/month, and has a larger percentage of owner/operators than YCA and thus typically requires less management involvement, pays a weekly fee of $35 per affiliate per week

  - Based on 329 members, the third-party license fee represents a cost of approximately $7 per week per member

- American United, which owns its own colors and provides TAS with space at its gas station located at Western and Belmont for an additional cashiering site, pays a weekly fee of $37 per affiliate per week

- Blue Diamond, which is intended to be a low-cost affiliation that provides the bare minimum of services to meet City requirements and otherwise does not generally interact with its members, pays a weekly fee of $12 per affiliate per week; its drivers generally do not receive any radio dispatch, and some affiliation members drive using Gold Coast Taxi colors and have particularly limited services

- The additional fee paid by YCA appears reasonable compared to the other affiliations in that the differentiation of services described above justifies the varying fees.  It does not appear to be designed to transfer funds from the debtor on an arbitrary basis or in excess of other affiliations for identical services



## ▶ Services Agreement Income and Expense Recognition

– In 2013, YCA largely accounted for its relationship with TAS in accordance with the Services Agreement, albeit not in a timely manner and cash was not directly transferred in the amounts stipulated by the Services Agreement

- Recorded service agreement fees of $3.5 million calculated in accordance with the Services Agreement

- Recognized expense reimbursement for payroll obligations to Checker, Blue Diamond and American United for $801k to cover payroll expense incurred by the other affiliations in excess of their share of the number of phone calls received

- Recognized expense reimbursement obligations to TAS for expenses related to dispatch operations allocated on the basis of the number of phone calls received; allocation was performed only at year-end and represented $713k for utilities including telephone and internet, rent, computer supplies, radio equipment and repair, and dispatch operations

- Reimbursed TAS, Checker, Blue Diamond and American United via a journal entry to due to/due from accounts; actual invoices or account statements are not prepared

– In 2014, YCA initially proceeded in a similar manner as in 2013, but reversed the initial recognition of service agreement fees and changed the accounting methodology

- Ceased service agreement fees with TAS and reversed $3.5 million in previously recognized costs for 2014

- Recognized expense reimbursement for payroll obligations to Checker, Blue Diamond and American United for $882k

- Recognized expense reimbursement to TAS for expenses related to dispatch operations for $817k

- Recognized expense reimbursement to TAS for all non-dispatch expenses except for credit card fees, management fees and some minor other categories based on an allocation using vehicles in service for a total of $3.6 million

- Reimbursed TAS, Checker, Blue Diamond and American United via a journal entry to due to/due from accounts; actual invoices or account statements are not prepared



## ▶ Services Agreement Income and Expense Recognition (continued)

– In 2015, YCA is trying to recognize expense allocation on a monthly basis, particularly subsequent to the bankruptcy filing, but is behind in the accounting entries and did not close accounting periods through June 2015 until mid-November 2015

- Had recognized $1.25 million in service agreement fees in 2015 for April to July 2015 but then reversed them as part of the closing process in order to account for payments to TAS based on the same allocation methodology used in 2014

- Management indicated they caused YCA to pay TAS at the rate of approximately $101k but the actual transfers appeared to be different amounts and the expense entries were ultimately reversed

  – For example, YCA paid TAS $117,302.64 on April 17, 2015 and recorded the offset as an increase in the intercompany due from TAS. On April 30th, the company recorded a service agreement expense in the same amount and a reduction in the intercompany due from TAS

  – An additional example: YCA paid TAS $101,188.64 on each of May 7th and May 22nd, and $245,743.84 on May 27th, with all entries recorded as an intercompany receivable due from TAS; in an entry dated May 31st, recorded in a sequential journal entry as the one for April above, the company recorded a service expense for the total of $448,121.22 and a reduction in the intercompany due from TAS

- Performed a reconciliation of actual TAS expenses in July 2015 and determined the allocation rate was too high, and reduced the monthly rate to $79k per month, while recording an adjusting entry in June 2015 to correct for the previous over accrual

– It appears the TAS expense recognition and timing of cash transfer are still subject to TAS cash availability and needs of the broader Yellow Group

– Ultimately YCA performed an allocation of all TAS expenses in a similar manner as for the 2014 allocation; as part of this allocation exercise, which was not entered until November 2015, most prior recognized service agreement fees were reversed and instead allocated expenses were recorded to individual general ledger accounts



## Services Agreement Income and Expense Recognition (continued)

– A summary of the allocated expenses is as follows:

| Description | Basis | 2013 | 2014 | Pre-Petition 2015 | Post-Petition to June 2015 |
|---|---|---|---|---|---|
| Service Agreement fees (base and additional) | Contract | $ 3,538 | $ - | $ - | $ - |
| Dispatch payroll allocation | Calls | 801 | 882 | 178 | 213 |
| Dispatch overhead expenses | Calls | 713 | 817 | 94 | 114 |
| General TAS overhead expenses | Vehicles | - | 3,621 | 720 | 756 |
| Total expense with TAS | | $ 5,051 | $ 5,319 | $ 993 | $ 1,082 |

– In 2013, the only allocated expenses were dispatch payroll and overhead, which were allocated based on the number of telephone call dispatch requests received

– In 2014, most expenses of TAS were allocated, with the dispatch payroll and overhead allocated in the same manner as 2013, but with the remainder of the expenses allocated based on the number of vehicles in each affiliation; this allocation did not occur until early 2015 when TAS was closing the books for 2014

– In 2015, a similar methodology was used as in 2014 though the allocation was not performed until November 2015 for the first six months of the year

– Had YCA paid service agreement fees at $2,500 per month and $45 per member per week beyond 20 vehicles, the expense to YCA would have likely been approximately the same in 2013 and 2014 and potentially represent an additional cost in 2014 assuming dispatch payroll and dispatch overhead was still separately allocated:

| | 2013 | 2014 | 2015 |
|---|---|---|---|
| Service Agreement fees (2014 and 2015 pro forma; 2015 annualized) | $ 3,538 | $ 3,643 | $ 3,643 |
| General TAS overhead expenses | 3,621 | 3,621 | 2,952 |
| Variance | $ 83 | $ (22) | $ (690) |



## YCA Transactions with Dimension Media

- The City of Chicago began allowing advertisements in taxicabs in 2006 and Dimension Media was set-up to provide media brokerage and mobile advertising services

- As a brokerage, Dimension only earned a commission on the sales of advertising.  The actual advertising revenue accrues to the owner of the vehicle, though the Ordinance requires some of the revenue to be shared with drivers.  Affiliations did not receive advertising revenues or brokerage commissions

- Mobigosee was a mobile marketing company

- Due to declining profitability, both Dimension Media and Mobigosee were shut down in 2013 and no longer have any operations.  Thus, Yellow Group does not have any current involvement in providing advertising to any YCA member vehicles.

- Market rates for advertising declined significantly over the past several years due to the rise of digital media; current rates are roughly $65 per week per cab and there is insufficient demand to provide advertising for all taxicabs in the City of Chicago.

- Dimension Media's charter remains active but Mobigosee's charter was revoked by the State of Illinois

- It does not appear YCA is improperly diverting or giving up potential advertising revenue as it was not entitled to such revenues in the first place as the ad revenue belongs to the owner of the taxicab

▶ Section VI – YCA Financial Information





## Status of YCA Accounting in 2015

- YCA provided the Examiner with direct system access to the general ledger

- Upon filing bankruptcy, YCA was split into two separate companies within the general ledger system; one represents the pre-petition debtor and one represents the post-petition debtor.  Not all assets or obligations of the pre-petition debtor are reflected on the general leger of the post-petition debtor

- As previously noted, all financial analysis conducted by the company is performed in Microsoft Excel, and no such "finalized" ledgers for the first half of 2015 were provided to the Examiner until Nov 17th

  - TAS is still finalizing general ledgers for July 2015 onwards

  - Opening balance for the YCA DIP general ledger did not carry over from the YCA pre-petition debtor, thus the balance sheet has incorrect data reflecting only post-petition balance sheet activity.  This may result in nonsensical data such as negative fixed assets

  - Certain reconciling activity for the pre-petition debtor was entered in November 2015 and dated to June 2015

  - Additional reconciling entries will be required; in particular, it was noted the intercompany receivable and payable due from and to TAS did not reconcile with the TAS general ledger

  - Activity is not recorded timely or concurrently; for example, monthly fees to TAS for April and May were recorded with sequential journal entry numbers, indicating they were entered at approximately the same time, though entries were dated April 30th and May 31st.  There was a cash transfer in the same amount as the April fees on April 17th.



## YCA Balance Sheets

| Yellow Cab Affiliation Inc. | 2013 | 2014 | Pre-Petition June 30, 2015 | Post-Petition June 30, 2015 |
|---|---|---|---|---|
| Cash | $ 23,416 | $ (8,370) | $ (16,498) | $ 72,459 |
| Accounts receivable | 1,212,195 | 867,132 | 867,132 | - |
| Intercompany receivables | 9,034,299 | 20,086,295 | 22,568,384 | 6,585,713 |
| Prepaid expenses | 60,871 | 30,110 | 18,962 | (2,762) |
| Fixed assets, net | 956,306 | 884,122 | 847,841 | (49,526) |
| Total assets | $ 11,287,087 | $ 21,859,289 | $ 24,285,821 | $ 6,605,883 |
| | | | | |
| Accounts payable | $ 585,143 | $ 31,510 | $ 5,892 | $ - |
| Intercompany payables | 10,945,353 | 19,752,802 | 22,546,292 | 6,469,812 |
| Accrued expenses | 18,182 | 8,305 | 19,763 | (15,637) |
| Accrued insurance reserves | - | 2,402,487 | 2,157,967 | - |
| Net equity | (261,591) | (335,815) | (444,092) | 151,709 |
| Total liabilities and equity | $ 11,287,087 | $ 21,859,289 | $ 24,285,821 | $ 6,605,883 |

– YCA is thinly capitalized and shows negative equity at year-end for both 2013 and 2014 and at June 30, 2015

– Most of YCA's assets and liabilities are intercompany, reflecting the entity's substantial reliance on related parties for its activities

– The large accounts payable balance at year-end 2013 represents a reclassification of a large credit balance in the cash account representing outstanding checks; the reclassification was not made at year-end 2014 or for interim dates in 2015

– Fixed assets generally represent radios installed in taxicabs by Taxi Works LLC; negative fixed assets at June 30 is a result of not carrying forward opening balances in the YCA DIP general ledger

– The accrued insurance reserves at year-end 2013 represents accrued insurance expenses estimated by management at year-end; more details are presented later in this report. This balance was also not carried forward to the YCA DIP general ledger

– Intercompany receivables and payables represents only that activity that occurred pre- or post-petition; pre-petition balances were not carried forward



## ▶ YCA Income Statements

| Yellow Cab Affiliation Inc. | 2013 | 2014 | Jan 1 to Mar 17 | Mar 18 to Jun 30 |
|---|---|---|---|---|
| Affiliation dues and late fees | $ 14,057,123 | $ 15,272,026 | $ 2,719,373 | $ 4,359,574 |
| Other revenue | - | 3,780,807 | - | - |
| Total revenues | 14,057,123 | 19,052,834 | 2,719,373 | 4,359,574 |
| Insurance premiums | 7,688,753 | 11,586,240 | 1,661,635 | 2,817,494 |
| Service agreement fees | 3,537,712 | 135,086 | - | 61,150 |
| Officer and general salaries | 1,470,148 | 1,435,500 | 584,254 | 721,649 |
| Bad debt expense | - | 1,103,469 | - | - |
| Miscellaneous | - | 1,685,039 | - | - |
| Other expenses | 1,346,401 | 5,970,233 | 581,760 | 607,572 |
| Total expenses | 14,043,014 | 19,127,059 | 2,827,649 | 4,207,865 |
| Net profit (loss) | $ 14,110 | $ (74,225) | $ (108,277) | $ 151,709 |

– YCA has historically reported a net income or net loss of $100,000 or less between 2011 and 2014; the net income for 2013 and 2014 matched that reported to the IRS on YCA's federal tax return.

– Revenue and expense bridges are presented on later pages

– The classification of miscellaneous expenses not recognized in 2013 stems from the change in allocation methodology for the accounting of the TAS service agreement; payroll expenses at TAS not previously allocated were reclassified as miscellaneous to maintain comparable results in officer and general salaries between 2013 and 2014

– The remainder of individual line items at TAS allocated to YCA were recorded in comparable categories and accumulated as other expenses for presentation purposes here; actual line items range from sanitation to armored car services to postage

– Service agreement fees post-petition result from the initial recording of TAS payments as service agreement fees but then reclassified in accordance with the allocation methodology used for 2014; the remaining balance appears to be a likely accounting error



# YCA Revenue Bridge

| Revenue Bridge | Amount |
|---|---|
| Total revenue in 2013 | $ 14,057 |
| Increase in affiliation dues | 1,215 |
| Revenue from insurance premiums returned | 3,781 |
| Total revenue in 2014 | $ 19,053 |

- Affiliation due revenue increased by $1.2 million from 2013 to 2014. Standard rates rose from $181/week in 2013 to $192/week in 2014 and ultimately to $195/week in 2015. Average membership in 2013 was 1,529 and average membership in 2014 was 1,486

- The $3.8 million revenue item represented revenue recognized from the return of insurance premiums previously paid to Pacesetter, YCA's third-party administrator for a now defunct insurance program run with Ullico. Though the funds were received in June 2013, YCA did not record the payment until it was doing year-end closing entries in early 2015; the entry was dated December 31, 2014. More details are presented later in this report



## YCA Expense Bridge

– Total expenses recognized by YCA increased significantly from 2013 to 2014; the primary drivers of the increased expenses were insurance costs of both liability and workers compensation policies and the write-off of a receivable due from Khaled Mahmoud, a large fleet member of YCA

| Expense Bridge | Amount |
|---|---:|
| Total expenses in 2013 | $ 14,043 |
| Reversal of Services Agreement fees | (3,538) |
| Newly allocated TAS overhead expenses | 3,621 |
| Increase liability insurance expense | 3,303 |
| Write-off of Khaled Mahmoud receivable | 1,024 |
| Increased workers compensation expenses | 595 |
| Net other expenses changes | 79 |
| Total expenses in 2014 | $ 19,127 |

– While workers compensation premiums increased organically from 2013 to 2014 the largest driver of liability insurance expense was a series of entries made in early 2015 but recorded as of December 31, 2014 to reflect usage of an insurance payment originally received in June 2013 and not previously recorded by YCA, as described on the following pages

– The Khaled Mahmoud receivable represented a fleet owner that fell significantly behind on his affiliation dues and other obligations and was partially written-off at year-end 2014; further details are provided later in this report



## YCA Insurance Reserves – Background of $4.9 Million Insurance Receipt

- From 2011-2012, YCA used a high-deductible risk-sharing insurance program offered by the Ullico Casualty Company to provide coverage to affiliation members

  - Individual drivers and vehicle owners were issued policies by Ullico meeting statutorily-required insurance with a $350k limit and a $1k deductible

  - YCA shared in the financial responsibility for claims under the program with a stop-loss policy provided by Ullico to cover claims up to $350k subject to a $150k deductible

  - YCA was required to pre-fund the program based on Ullico's claims estimates; funds were held by Pacesetter Claims Service, an independent third-party administrator

- Ullico failed in May 2013 and was placed into Receivership and ordered to be liquidated

  - The Illinois Insurance Guaranty Fund ("IIGF"), a quasi-governmental company created by statute, assumed responsibility for liquidating the company and adjudicating pending and future claims

  - The IIGF periodically billed YCA for deductibles relating to loss claims occurring from 2011-2013.  No requests for payment have been received by YCA since the date of the bankruptcy.

- Checker also used the insurance program, but American United and Blue Diamond did not; a prior program with Lexington (AIG) did involve Blue Diamond



# YCA Insurance Reserves – Background of $4.9 Million Insurance Receipt

– As part of the liquidation, funds paid to Pacesetter Claims Service that had not been paid into the regulated insurance company were returned in June 2013; the funds totaled $4.9 million and were deposited by TAS into its petty cash account

- TAS used or kept approximately $474k for its own purposes

- $4.0 million was escrowed with Gemini in March 2014 on behalf of YCA and Blue Diamond; YCA was allocated $3,780,800 and Blue Diamond was allocated $219,200 of this amount on the relative basis of each entity's premium payments

- At the time the funds were returned, estimated open reserves remaining for 2011-2012 were $4,113,682

– Though the funds were received in June 2013 and related to a return of funds from the third-party administrator, Pacesetter, for payments made by or on the behalf of YCA and Blue Diamond, no entries were made on the books and records of YCA until early 2015 with a record date of December 31, 2014

– An internal analysis that appeared to have been prepared in August 2014 listed possible uses of the remaining escrow funds, including losses at Taxi Works, an investment in StickOutSocial, investigation costs for a credit card fraud issue, accounting fees for an IRS audit, telephone equipment upgrades, Yellow Medallion Holdings and CL Medallion Holdings filing fees and other miscellaneous expenses across the wider organization.  However, in actuality TAS used the funds primarily for insurance tail expenses as listed on the following pages



## ▶ YCA Insurance Reserves – Usage and Accounting

| No. | Description | Ultimate Beneficiary | Date | Amount | Balance |
|---|---|---|---|---|---|
| | *Initial cash receipt at TAS* | | 06/26/13 | $ 4,861,782 | $ 4,861,782 |
| 1 | Kept to offset losses | TAS | 07/30/13 | (474,315) | 4,387,467 |
| 2 | 2008-2009 insurance tail | Lexington (AIG) | 07/30/13 | (387,467) | 4,000,000 |
| | *Balance transferred to Gemini* | | 03/01/14 | | |
| 3 | 2008-2009 insurance tail | Lexington (AIG) | 03/07/14 | (367,944) | 3,632,055 |
| 4 | March 2014 liability insurance | Transit General | 04/10/14 | (490,000) | 3,142,055 |
| 5 | April 2014 liability insurance | Transit General | 04/29/14 | (626,443) | 2,515,612 |
| 6 | 2012-2013 insurance tail | IL Ins Guaranty Fund | 06/11/14 | (111,742) | 2,403,870 |
| 7 | June 2014 liability insurance | Transit General | 06/26/14 | (450,000) | 1,953,870 |
| 8 | 2012-2013 insurance tail | IL Ins Guaranty Fund | 08/05/14 | (150,000) | 1,803,870 |
| 9 | 2008-2009 insurance tail | Lexington (AIG) | 08/05/14 | (239,000) | 1,564,870 |
| 10 | 2012-2013 insurance tail | IL Ins Guaranty Fund | 10/21/14 | (105,939) | 1,458,931 |
| 11 | Fund standby letter of credit | Lexington (AIG) | 10/21/14 | (500,000) | 958,931 |
| 12 | Fund standby letter of credit | Liberty Mutual | 11/20/14 | (50,000) | 908,931 |
| 13 | Fund standby letter of credit | Liberty Mutual | 11/28/14 | (125,136) | 783,795 |
| 14 | Jan 2015 liab ins and 2012-2013 tail | Transit General / AIG | 01/07/15 | (400,000) | 383,795 |
| 15 | 2012-2013 insurance tail and TAS | IL Ins Guaranty Fund / TAS | 01/21/15 | (376,771) | 7,024 |
| 16 | Bank fees | Unspecified | | (7,024) | - |

— Usage #1: $474,315 kept by TAS to "fund cumulative losses"

- TAS recorded a reduction in liability premium expense as part of the offsetting entry to the receipt of the cash

- Because TAS does not normally have any liability premium expense, this entry was in effect income to TAS and reduced total expenses recognized in its financial statements



## YCA Insurance Reserves – Usage and Accounting

- Usage #2: $387,467 payment to Lexington (AIG) for 2008-2009 tail claims

  - Payment made from TAS

- In 2014, the remaining $4 million was determined to belong to YCA and Blue Diamond

  - Escrow was established on December 31, 2014 for $3,780,800 with an entry recognizing revenue and a receivable due from Gemini; the allocation was based on premiums paid in total by YCA and Blue Diamond in 2011-2012

  - The accountants that prepare the tax returns for the various entities indicated this money must be recognized as income in order to avoid restating prior year's tax returns since the original payments had been deducted as an expense

- Usage 3: $367,944.37 to Lexington Insurance (AIG) for 2008-2009 tail claims and deductible payments

  - Cash transferred back from Gemini to TAS on March 7, 2014

  - Payment made to Lexington Insurance on March 10, 2014 with offsetting entry to insurance reserve at TAS

  - Payment reversed on December 31, 2014 from insurance reserve at TAS and allocated to YCA, Checker and Blue Diamond based on AIG payments made in 2008-2009; TAS reduces the receivable due from YCA for $260,431.03

  - YCA records premium liability expense for $260,431.03 on December 31, 2014 with offsetting entry reducing the receivable due from TAS

  - Later entry at YCA on December 31, 2014 transfers the offsetting entry to Gemini, with an increase in the receivable due from TAS and a reduction in the receivable due from Gemini



## YCA Insurance Reserves – Usage and Accounting (continued)

– Usage #4: $490,000 sent to Transit General to cover the March 2014 liability insurance premium

- Internal insurance schedule shows date to be April 10, 2014

- Cash schedule shows a cash transfer received by YCA from Gemini on April 11, 2014 towards the March liability payment to Transit General

- YCA recorded the receipt of cash on April 11, 2014 with the offsetting entry as a loan payable to Gemini; on April 29, 2014, this was later transferred to a different loan payable account to Gemini

- YCA initially recorded the insurance expense as of March 5, 2014 with the offsetting entry to accounts payable; the accounts payable was then reversed with check number 1518 dated March 6, 2014

- This payment was later offset on December 31, 2014 from the loan payable account to Gemini with a reduction in the intercompany payable to TAS account

- It was later determined that because the entire $490,000 came from the escrow account when the account belonged to both YCA and Blue Diamond that YCA owed Blue Diamond $26,852 for funds it essentially borrowed from Blue Diamond and on December 31, 2014 YCA recorded an intercompany receivable due from Gemini and an intercompany payable to Blue Diamond

- It is believe the check transaction was backdated to early March 2014 but generated in mid-April 2014. The Examiner was unable to obtain further information regarding this potentially back-dated check.

- As of October 31, 2015, Gemini had not recorded the transfer of cash in its own general ledger



## YCA Insurance Reserves – Usage and Accounting (continued)

- Usage #5: $626,443.29 sent to Transit General to cover the April 2014 liability insurance premium

  - YCA received a cash transfer from Gemini on April 29, 2014 that it used to make the April 2014 liability insurance premium payment to Transit General on April 30, 2014.

  - YCA recorded the cash receipt with an offsetting loan payable to Gemini; on April 29, 2014, this payment along with the prior payment was transferred to a different loan payable account to Gemini

  - This payment was later offset on December 31, 2014 from the loan payable account to Gemini with a reduction in the intercompany payable to TAS account

  - It was later determined that because the entire $626,443.29 came from the escrow account when the account belonged to both YCA and Blue Diamond that YCA owed Blue Diamond $34,329.09 for funds it essentially borrowed from Blue Diamond and on December 31, 2014 YCA recorded an intercompany receivable due from Gemini and an intercompany payable to Blue Diamond

  - As of October 31, 2015, Gemini had not recorded the transfer of cash in its own general ledger



# YCA Insurance Reserves – Usage and Accounting (continued)

- Usage #6: $111,742.25 sent to the Illinois Insurance Guaranty Fund for 2012-2013 claims

  - Gemini directly paid the Illinois Insurance Guaranty Fund on or about June 11, 2014

  - YCA recorded insurance expense of $105,618.77 and a reduction in the receivable due from Gemini; the entry is dated December 31, 2014

  - The remaining $6,123.48 was recorded as an expense at Blue Diamond

- Usage #7: $450,000 sent to Transit General to cover the June 2014 liability insurance premium

  - YCA received $450,000 from Gemini on June 26, 2014 and recorded the offsetting entry to accrued expenses; an entry on the same date reclassified the offsetting entry to reflect a loan payable to Gemini

  - An entry on December 31, 2014 was made to reclassify the loan payable to Gemini to the intercompany payable due to TAS

  - A further entry on December 31, 2014 was made to reduce the receivable due from Gemini and reduce the payable due to TAS

  - It was later determined that because the entire $450,000 came from the escrow account when the account belonged to both YCA and Blue Diamond that YCA owed Blue Diamond $24,660 for funds it essentially borrowed from Blue Diamond and on December 31, 2014 YCA recorded an intercompany receivable due from Gemini and an intercompany payable to Blue Diamond

  - As of October 31, 2015, Gemini had not recorded the transfer of cash in its own general ledger



## YCA Insurance Reserves – Usage and Accounting (continued)

– Usage #8: $150,000 sent to the Illinois Insurance Guaranty Fund for 2012-2013 claims

  • Gemini directly paid the Illinois Insurance Guaranty Fund on or about August 5, 2014

  • YCA recorded insurance expense of $150,000 and a reduction in the receivable due from Gemini; the entry is dated December 31, 2014

  • Because a portion of the expense should have been incurred by Blue Diamond, YCA later made an entry dated December 31, 2014 for $8,220 reducing its insurance expense and increasing the receivable due from Gemini

– Usage #9: $239,000 sent to Lexington Insurance (AIG) for 2008-2009 tail claims and deductibles

  • Gemini directly paid Lexington Insurance on or about August 5, 2014

  • YCA recorded insurance expense dated December 31, 2014 of $169,164.20 representing its allocated portion of the premiums paid in total to AIG by YCA, Checker and Blue Diamond in 2008 and 2009

  • Because a portion of the expense was attributed to Checker, who had not made payments that resulted in the funds being received from Pacesetter, YCA also recorded on December 31, 2014 a reduction in its payable to Checker for $56,738.60 with an offsetting reduction in its receivable due from Gemini; Checker also recorded an intercompany payable due to Blue Diamond



# YCA Insurance Reserves – Usage and Accounting (continued)

- Usage #10: $105,938.80 sent to the Illinois Insurance Guaranty Fund for 2012-2013 claims

  - Gemini directly paid the Illinois Insurance Guaranty Fund on or about October 21, 2014

  - YCA recorded insurance expense of $100,133.35 and a reduction in the receivable due from Gemini; the entry is dated December 31, 2014

- Usage #11: $500,000 sent to Capital One to fund a standby letter of credit

  - Gemini directly paid Capital One on or about October 21, 2014

  - YCA recorded insurance expense dated December 31, 2014 of $353,900 representing its allocated portion of the premiums paid in total by YCA, Checker and Blue Diamond in 2008 and 2009

  - Because a portion of the expense was attributed to Checker, who had not made payments that resulted in the funds being received from Pacesetter, YCA also recorded on December 31, 2014 a reduction in its payable to Checker for $118,700 with an offsetting reduction in its payable to Gemini

  - The remaining balance of $27,400 was recorded at Blue Diamond

  - Management provided a copy of the Pledge Agreement indicating the bank account holding $500,000 was owned by TAS; no mention of YCA is made in the documentation

  - Another version of the insurance schedule indicates payment was made to Capital One TFA4; TFA4 is a Transit Funding entity.  Management has not provided further information regarding this payment.



# YCA Insurance Reserves – Usage and Accounting (continued)

- Usage #12: $50,000 sent to Capital One to fund a standby letter of credit benefiting Liberty Mutual

  - Gemini transferred funds on or about November 20, 2014

  - YCA recorded insurance expense of $50,000 and a reduction in the receivable due from Gemini; the entry is dated December 31, 2014 and is marked as pertaining to pre-2008 workers compensation expense

  - Management provided a Pledge Agreement listing TAS as the Debtor and owner of the funds held in a certificate of deposit at Capital One Bank with YCA, Checker and Blue Diamond listed as Borrower

- Usage #13: $125,136 sent to Capital One to fund a standby letter of credit benefiting Liberty Mutual

  - Gemini directly paid Capital One on or about November 28, 2014

  - YCA recorded insurance expense of $125,136 and a reduction in the receivable due from Gemini; the entry is dated December 31, 2014 and is marked as pertaining to pre-2008 workers compensation expense

  - Management provided a Pledge Agreement listing TAS as the Debtor and owner of the funds held in a certificate of deposit at Capital One Bank with YCA, Checker and Blue Diamond listed as Borrower

- Usage #14: $400,000 sent to Transit General for the January 2015 premium payment and to Lexington

  - Approximately $300k was allocated to Transit General and $100k to Lexington; internal scheduled indicates January 7, 2015

  - Payment was made directly by Gemini and did not flow through YCA except as changes to intercompany receivables and payables with Gemini and TAS



## YCA Insurance Reserves – Usage and Accounting (continued)

- Usage #15: $376,771.11 sent to YCA for 2012-2013 claims and unspecified purposes

  - Funds were transferred to YCA on January 21, 2015

  - Essentially closed out the "escrow" account as it was the last significant amount of money remaining

  - On January 26, 2015, YCA made a $150,000 payment to the Illinois Insurance Guaranty Fund and transferred $220,000 to the TAS general operating account.  YCA had previously received $220,000 from TAS on January 21, 2015.

- Usage #16: $7,024.18 was attributed to undefined bank fees and represented the balance of the escrow funds

- Additionally, TAS transferred its remaining insurance reserves of $1,021,591.85 to YCA, Checker and Blue Diamond, with the allocation based on the proportion of total payments made to AIG in 2008-2009.  YCA's portion totaled $723,082.71.



## ▶ YCA Affiliation Dues Status

– Revenue is generally only recognized when collected and no accrued revenue is recorded for weekly affiliation dues levied; however, the cashiering system tracks individual medallion owner receivables

– One exception was for a large fleet owner that fell seriously delinquent on his affiliate and other obligations, which were due at an approximate rate of $13k per week; TAS and YCA began accruing revenue and receivables related to affiliation dues owed by Khaled Mahmoud.

- To repay the obligations, Mahmoud and TAS agreed that Mahmoud would provide a second lien on his medallions and immediately begin selling his medallions

- After selling 9 of 20 medallions, Mahmoud was no longer able to sell further medallions due to the drying up of liquidity in the medallion market; most of the medallions were sold to Leonid and Natalia Sorkin who are one of the largest medallion owners in Chicago

- Further, the market values of the medallions have declined to a point that Khaled has negative equity in the medallions relative to the first lien secured debt, and thus TAS no longer believed their second lien position had any value

- As of June 30, 2015, YCA still had an accounts receivable of $704k due from Khaled Mahmoud that was unreserved; on October 5, 2015, Mahmoud filed for Chapter 7 bankruptcy protection in the Northern District of Illinois listing $11k in assets and over $35 million in liabilities and thus the remaining balance is likely uncollectable

– In a similar manner, YCA accrued revenues related to Adrian Tudor, another large fleet owner that was falling behind on obligations.  As of November 9, 2015, Adrian Tudor owed YCA $203k and was 6-7 weeks behind.  Though YCA accrued revenues for Adrian Tudor, he does not appear to be the largest or most delinquent fleet owner with a balance owing YCA as seen in the following pages



# ▶ YCA Affiliation Dues Status

– Management recognizes affiliation dues when collected, and has verbally represented YCA and the other affiliations have increasingly experienced difficulty collecting affiliation dues as a result of market disruptions caused by competition from ride-sharing networks such as Uber and Lyft

– Effective February 1, 2015, the City reduced the amount license holders could collect from drivers by roughly $100 per week depending on the vehicle category, resulting in a significantly worse performance in 2015 as fleet owners in particular had more difficult economics to overcome

| Date | Total | % Over 60 |
|------|------|-----------|
| 03/31/14 | $ 1,030,736 | 87.8% |
| 06/30/14 | 700,614 | 81.3% |
| 09/30/14 | 620,681 | 67.3% |
| 12/31/14 | 518,894 | 38.8% |
| 03/16/15 | 742,535 | 24.9% |
| 03/31/15 | 715,547 | 9.4% |
| 06/30/15 | 695,013 | 56.7% |
| 09/30/15 | 843,394 | 66.9% |
| 11/09/15 | 904,983 | 66.2% |

– At the petition date, All City Taxi had a delinquent balance of $153k.  All City Taxi manages medallions as a sub-manager to TMM and its portfolio includes those medallions owned by Pat Corrigan and Mike Levine

   • Of the total balance, $33k related to the Corrigan and Levine medallions and ranged from 4-10 weeks late

   • This sub-manager was shown as current at November 9, 2015

– Delinquency was $1.03 million at March 31, 2014 and $716k at March 31, 2015, with a significantly less portion of it aged greater than 60 days in 2015 compared to 2014



MORRIS ANDERSON

# YCA Affiliation Dues Status

| Fleet Name (Primary Contact) | 1-30 Days | 31-60 Days | 61-90 Days | 90+ Days | Total |
|---|---|---|---|---|---|
| Goodbar Fleet (Charles Goodbar III) | $ - | $ - | $ - | $ 224,400 | $ 224,400 |
| Tudor Fleet (Adrian Tudor) | - | 202,917 | - | - | 202,917 |
| Poorian Fleet (Ali Poorian) | - | - | - | 75,816 | 75,816 |
| Tibi Fleet (Leonid Sorkin) | - | - | - | 98,923 | 98,923 |
| Vasken Fleet (Vasken Kodjavakian) | - | - | - | 63,047 | 63,047 |
| Abdul Fleet (Khaled Mahmoud) | - | - | - | 10,642 | 10,642 |
| Jim Siddiqui Fleet (Khalid Siddiqui) | - | - | 15,782 | 49,407 | 65,189 |
| Shams Fleet (Leonid Sorkin) | - | - | 42,001 | 9,748 | 51,749 |
| Non-Fleet | 38,962 | 63,708 | 9,630 | - | 112,300 |
| Total YCA | $ 38,962 | $ 266,624 | $ 67,414 | $ 531,983 | $ 904,983 |
| *Percentage* | *4.3%* | *29.5%* | *7.4%* | *58.8%* | *100.0%* |

- Leonid and Natalia Sorkin were the primary buyers of the medallions sold by Khaled Mahmoud and the Sorkin's fleet manager has been unable to remain current with the medallions either

- Some of these delinquent medallion owners are also severely delinquent with other affiliations including Vasken (Checker), Shams (Blue Diamond), Abdul (American United) and Poorian (American United)

- Performance of fleet owners has markedly degraded since petition date, while individual owners have improved delinquency

- Management believes performance will continue to degrade since fleet owners may struggle to replace vehicles in early 2016 when the portion of their existing fleets is required to be replaced due to Ordinance



MORRIS ANDERSON

# YCA Related Party Balances

- YCA, along with the other entities in the Yellow Group and other related entities, generally do not move cash amongst themselves
- Cash is instead concentrated at TAS and moved to other entities only when necessary to fund disbursements made exclusively from those entities
- As a result, and because of the complex web of transactions between entities, most activity is recorded as an intercompany transfer

| | Per YCA | | | |
|---|---|---|---|---|
| | 2013 | 2014 | Pre-Petition at June 30, 2015 | Post-Petition at June 30, 2015 |
| *Net Balance* | | | | |
| Due from (to) TAS | $ (8,823,019) | $ (7,310,794) | $ 2,058,320 | $ 131,560 |
| Due from (to) TMM | 8,933,121 | 8,876,421 | (56,700) | - |
| Due from (to) Blue Diamond | 101,178 | 5,740 | 5,740 | - |
| Due from (to) Gemini | - | 740,843 | - | - |
| Due from (to) American United | (1,235,649) | (1,276,435) | (1,282,986) | (15,659) |
| Due from (to) Checker | (543,225) | (280,436) | (280,436) | - |
| Due from (to) Taxi Works | (243,460) | (321,845) | (321,845) | - |
| Due from (to) Metro Cabs | (100,000) | (100,000) | (100,000) | - |
| Net receivable (payable) | $ (1,911,054) | $ 333,493 | $ 22,092 | $ 115,901 |

- Management indicated the $8.9 million balance due from TMM arose from the collection of taxi affiliation dues paid by medallion owners. TAS performs all the cashiering for YCA and therefore it collected the actual cash payments. However, because cash is generally not transferred except when necessary, the funds should have been recorded at YCA as a receivable due from TAS. Instead, TAS mistakenly recorded these obligations on YCA's general ledger as a due from TMM. The balance was reclassified as a receivable due from TAS effective January 1, 2015; this entry was recorded as part of the recent closing process as it was not reflected in the bankruptcy reporting
- Intercompany balances generally represent amounts that no entity is capable of paying in cash, as the cash balance held at TAS is generally less than $1 million and other entities typically have nominal balances
- The due from Gemini represents the remaining funds received from the insurance payment; these funds were expended in early 2015

# YCA Related Party Balances

- The Examiner compared the related party balances due to and from other related entities to the general ledgers for those entities. Though not all balances were compared, several were noted to be unreconciled:

  - TAS and YCA did not agree on related party balances and further reconciliation is required

  - Gemini did not show a related party payable due to YCA at December 2013 or 2014, though it was holding $4 million and $741k, respectively, of money owed to YCA

  - At June 2015, it was noted the balances due to and from TAS and TMM were unreconciled on the TAS and TMM general ledgers with an unidentified difference of approximately $550k

  - Other related party balances not involving YCA at interim dates may be out of balance but were not examined

- In particular, substantial differences were noted to exist between whether YCA recorded a transaction as a receivable due from TAS and if TAS recorded the same transaction as a payable due to YCA or as a reduction in its receivable from YCA; the differences are attributed to the large volume of transactions between the two entities and the time lag in entering information between different sets of books

- The records for TAS do not agree with either the pre-petition YCA books or the post-petition YCA books

| | Per YCA | | | Per YCA DIP |
| | 2013 | 2014 | 30-Jun-15 | 30-Jun-15 |
|---|---|---|---|---|
| Due from TAS | $            - | $  10,463,291 | $  22,619,345 | $  6,585,713 |
| Due to TAS | (8,823,019) | (17,774,085) | (20,561,024) | (6,454,153) |
| Net due from (to) TAS | $  (8,823,019) | $  (7,310,794) | $  2,058,320 | $     131,560 |

| | Per TAS | | | Per TAS |
| | 2013 | 2014 | 30-Jun-15 | 30-Jun-15 |
|---|---|---|---|---|
| Due from YCA | $            - | $ (10,260,480) | $  11,090,556 | $  3,780,037 |
| Due to YCA | 8,823,019 | 17,571,274 | $ (13,263,413) | $ (4,359,574) |
| Net due from (to) YCA | $  8,823,019 | $  7,310,794 | $  (2,172,857) | $   (579,537) |

| | Per TAS | | | Per TAS |
| | 2013 | 2014 | 30-Jun-15 | 30-Jun-15 |
|---|---|---|---|---|
| Net difference | $            - | $            - | $   (114,537) | $   (447,977) |



# YCA Cash Rollforward – 2013

| Month | Beginning Balance | TAS Debit | Misc. Credits | PaceSetter | ProSite Specialty | Amer. Bus. Ins Svcs | Transit General (Liab) | McClure & Assoc (W/C) | Taxi Works | Payroll (ADP) | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-13 | $ (88,072) | $ 885,000 | $ (34,269) | $ (430,414) | $ - | $ (162,417) | $ (95,881) | $ (79,932) | $ - | $ (63,027) | $ (69,012) |
| Feb-13 | (69,012) | 815,000 | (6,533) | (429,452) | - | (149,635) | (91,717) | (79,932) | (156,727) | (60,525) | (228,533) |
| Mar-13 | (228,533) | 515,000 | (23,601) | (29,600) | - | (146,459) | (84,486) | (209,879) | (8,138) | (73,366) | (289,063) |
| Apr-13 | (289,063) | 815,000 | (1,909) | (29,600) | (100,000) | - | (622,140) | (147,897) | (74,329) | (57,174) | (507,111) |
| May-13 | (507,111) | 745,000 | (654) | (268,653) | - | - | - | (147,897) | (34,627) | (58,359) | (272,302) |
| Jun-13 | (272,302) | 1,069,000 | (2,416) | - | - | - | (1,040,461) | (110,923) | (79,767) | (70,944) | (507,813) |
| Jul-13 | (507,813) | 715,211 | (4,047) | - | - | - | (538,234) | (110,923) | (26,789) | (54,004) | (526,598) |
| Aug-13 | (526,598) | 680,000 | (5,974) | - | - | - | (520,662) | (55,900) | (32,130) | (53,782) | (515,046) |
| Sep-13 | (515,046) | 720,500 | (6,959) | - | - | - | (520,700) | (113,539) | (20,529) | (68,232) | (524,504) |
| Oct-13 | (524,504) | 1,310,000 | (23,793) | - | - | - | (516,952) | (113,539) | (104,546) | (53,439) | (26,774) |
| Nov-13 | (26,774) | 336,789 | (40,387) | - | - | - | (528,517) | (113,539) | (179,057) | (54,172) | (605,656) |
| Dec-13 | (605,656) | 745,300 | (4,045) | - | - | - | (528,500) | (113,539) | 59,275 | (59,859) | (507,024) |
| Total | $ (88,072) | $ 9,351,800 | $ (154,587) | $ (1,187,719) | $ (100,000) | $ (458,511) | $ (5,088,249) | $ (1,397,439) | $ (657,363) | $ (726,882) | $ (507,024) |

– The cash rollforward was prepared based on the general ledger activity for YCA's bank account.

– Debit activity primarily consisted of transfers from TAS towards operating expenses, with the proceeds generated from the collection of affiliation dues by TAS on YCA's behalf

– Most disbursements were to Transit General and McClure & Associates for general liability and workers compensation insurance coverage; because Pacesetter collapsed in early 2013, there was some effort by YCA to find replacement insurance coverage, as well as payments on insurance tails from prior years

– The next largest disbursements were for payroll and to Taxi Works for equipment maintenance; the Taxi Works activity in November and December 2013 represent ledgering errors that were subsequently corrected



# YCA Cash Rollforward – 2014

| Month | Beginning Balance | TAS Debit | Other Debit | Misc. Credits | Transit General (Liab) | McClure & Assoc (W/C) | Taxi Works | Payroll (ADP) | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|
| Jan-14 | $ (507,024) | $ 814,100 | $ - | $ (24,026) | $ - | $ (160,620) | $ (36,146) | $ (66,913) | $ 19,371 |
| Feb-14 | 19,371 | 214,700 | 29,600 | (2,368) | (1,069,435) | (160,620) | (19,692) | (54,410) | (1,042,855) |
| Mar-14 | (1,042,855) | 1,278,000 | - | (9,260) | (490,000) | (160,620) | (6,202) | (48,010) | (478,946) |
| Apr-14 | (478,946) | 278,000 | 1,116,443 | (31,529) | (626,443) | (160,620) | (37,636) | (45,574) | 13,694 |
| May-14 | 13,694 | 225,000 | - | (765) | - | (160,620) | (15,022) | (48,180) | 14,108 |
| Jun-14 | 14,108 | 898,000 | 450,000 | (7,563) | (1,122,598) | (160,620) | (12,892) | (45,172) | 13,263 |
| Jul-14 | 13,263 | 804,000 | - | (19,574) | (560,271) | (160,620) | (8,872) | (48,230) | 19,697 |
| Aug-14 | 19,697 | 791,000 | (75) | (2,897) | (581,363) | (160,620) | (10,824) | (44,012) | 10,906 |
| Sep-14 | 10,906 | 223,000 | - | (9,864) | (542,002) | (160,635) | (12,586) | (44,916) | (536,097) |
| Oct-14 | (536,097) | 1,354,000 | - | (20,055) | (559,189) | (160,635) | (19,017) | (56,383) | 2,623 |
| Nov-14 | 2,623 | 238,000 | 23,822 | (22,281) | (531,151) | (160,635) | (22,731) | (42,050) | (514,404) |
| Dec-14 | (514,404) | 1,285,000 | 8,568 | (42,651) | (519,878) | (160,635) | (7,097) | (57,273) | (8,370) |
| Total | $ (507,024) | $ 8,402,800 | $ 1,628,358 | $ (192,833) | $ (6,602,331) | $ (1,927,500) | $ (208,717) | $ (601,124) | $ (8,370) |

— The cash rollforward was prepared based on the general ledger activity for YCA's bank account.

— Debit activity primarily consisted of transfers from TAS towards operating expenses, with the proceeds generated from the collection of affiliation dues by TAS on YCA's behalf

— Other debits are miscellaneous activities, though the $1.1 million and $450k debits were transfers from Gemini related to the return of insurance premium payments from Pacesetter

— Most disbursements were to Transit General and McClure & Associates for general liability and workers compensation insurance coverage; the next largest disbursement was for payroll, followed by Taxi Works for equipment maintenance



## ▶ YCA Cash Rollforward – First Half 2015

| Month | Beginning Balance | TAS Debit | Misc. Debits | Misc. Credits | First Chicago | Amer. Bus. Ins Svcs. | McClure & Assoc. | Transit General (Liab) | Taxi Works | Payroll (ADP) | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-15 | $ (8,370) | $ 134,000 | $ 376,771 | $ (163,858) | $ (3,530) | $ (92,036) | $ (194,156) | $ - | $ (23,889) | $ (44,372) | $ (19,440) |
| Feb-15 | (19,440) | 270,000 | - | (7,650) | (6,581) | - | (194,156) | - | - | (37,467) | 4,707 |
| Mar-15 | 4,707 | 115,000 | 5,000 | (489) | (3,291) | (100,374) | - | - | (6,626) | (30,426) | (16,498) |
| Total | $ (8,370) | $ 519,000 | $ 381,771 | $ (171,996) | $ (13,401) | $ (192,410) | $ (388,313) | $ - | $ (30,515) | $ (112,265) | $ (16,498) |
| | | | | | | | | | | | |
| Mar-15 | $ - | $ 334,499 | $ - | $ (11,511) | $ (181,953) | $ (96,339) | $ - | $ - | $ - | $ - | $ 44,696 |
| Apr-15 | 44,696 | 715,918 | - | (6,718) | (184,340) | (93,943) | - | (225,775) | - | (51,796) | 198,042 |
| May-15 | 198,042 | 810,277 | - | (1,960) | (189,347) | (102,382) | - | (466,653) | (201) | (39,564) | 208,212 |
| Jun-15 | 208,212 | 722,835 | - | (15,333) | (177,747) | (75,938) | - | (523,409) | (11,573) | (54,587) | 72,459 |
| Total | $ - | $ 2,583,528 | $ - | $ (35,522) | $ (733,387) | $ (368,601) | $ - | $ (1,215,837) | $ (11,775) | $ (145,947) | $ 72,459 |

– The cash rollforward was prepared based on the general ledger activity for YCA's bank account and is subject to normal reconciling activity to the bank balance. The upper half represents the pre-petition bank account and the lower half represents the post-petition bank account.

– Debit activity primarily consisted of transfers from TAS towards operating expenses, with the proceeds generated from the collection of affiliation dues by TAS on YCA's behalf; January TAS debits are net of $220k sent back to TAS upon receipt of the $376k from the Gemini escrow account, $150k of which was paid on an insurance tail claim

– Upon filing of the bankruptcy petition, YCA stopped paying First Chicago for the workers compensation premiums through McClure, the insurance broker, and started paying First Chicago directly. YCA had previously paid general liability premiums directly to First Chicago. Payments to American Business Insurance Services are payments made to NY Marine

– Liability insurance premiums to Transit General prior to petition date were paid by TAS and expensed to YCA through intercompany journal entry; after petition date, YCA made payments directly

▶ Section VII – TAS Financial Information





## TAS Balance Sheets

| Taxi Affiliation Services Inc. | 2012 | 2013 | 2014 | 30-Jun-15 |
|---|---|---|---|---|
| Cash - Bank | $ 541,741 | $ 309,228 | $ 353,474 | $ 567,382 |
| Cash - Cashiering | 667,354 | 712,901 | 991,085 | 606,862 |
| Credit card clearing | 145,380 | 0 | (0) | (8,790,250) |
| Accounts receivable | 985,654 | 1,429,068 | 1,537,739 | 2,779,633 |
| Interco/related party receivables | 126,280,219 | 20,352,456 | 66,886,277 | 80,427,828 |
| Investments | - | 79,429 | 79,429 | 79,429 |
| Prepaid expenses | 105,390 | 114,590 | 69,721 | 97,014 |
| Fixed assets | 1,581,280 | 2,011,918 | 2,060,894 | 1,990,254 |
| Other assets | 49,190 | 34,855 | 36,411 | 39,424 |
| Total assets | $ 130,356,208 | $ 25,044,444 | $ 72,015,029 | $ 77,797,575 |
| | | | | |
| Accounts payable | $ 369,023 | $ 390,184 | $ (11,276) | $ 265,415 |
| Accrued expenses | 2,226,061 | 1,449,850 | 81,049 | 13,004 |
| Cashiering clearing | (17,576) | 0 | (1,027) | 2,313,279 |
| Credit card clearing | 196,236 | 575,837 | 1,572,154 | (6,107,378) |
| Third-party and related party debt | 32,132,598 | 8,272,913 | 6,604,011 | 6,584,011 |
| Interco/related party payables | 93,838,416 | 14,124,230 | 40,462,583 | 54,268,783 |
| Other liabilities | 3,049,946 | 4,461,105 | 3,472,990 | 733,040 |
| Investment equity | - | - | 25,380,801 | 25,380,801 |
| Net equity | (1,438,495) | (4,229,675) | (5,546,256) | (5,653,380) |
| Total liabilities and equity | $ 130,356,208 | $ 25,044,444 | $ 72,015,029 | $ 77,797,575 |

– TAS provided the Excel general ledger extracts that was essentially a trial balance, thus the presentation to the left represents the Examiner's summation of general ledger accounts

– The investment asset account is in a company called Street Media Partners, which placed advertising on spinning hub cabs. Management believes the investment is worthless

– Further details including that for the investment equity account are provided on subsequent pages for significant categories of balance sheet items



# ▶ TAS Balance Sheets – Cash, Cashiering and Credit Cards

– One of the primary activities of TAS is the provision of cashiering services to the various entities of the wider organization; as part of the cashiering operations, TAS maintains substantial currency balances in its cashiering locations for purposes of paying out drivers.  The cash balance on the balance sheet represents the TAS operating account and the cashiering accounts represent currency in the safe and on premises

– TAS is a net user of currency: because TAS processes all credit cards in the various affiliations, it receives the deposits resulting from the credit card transaction.  Upon presentment of a credit card receipt, drivers receive cash at the cashiering window.  The sum of the currency received from drivers and medallions owners towards various payments is insufficient to offset the amount of credit card proceeds received by TAS that must be paid out to the drivers

   • TAS averaged $371k in daily credit card receipts from January 1, 2014 to October 7, 2015

   • Total receipts in 2014 were nearly $92 million and were $73 million through Oct. 7 2015

– TAS has two primary credit card clearing accounts to record activity related to credit card receipts and payments to drivers; one is on the asset side of the ledger and represents the receipt of the proceeds from merchant accounts, the other is on the liability side of the ledger and represents the payment obligation to drivers

   • The asset clearing account clears when the funds are transferred to the TAS operating account

   • The liability clearing account clears during the cashiering process when drivers are paid against receipts presented and the Company recognizes credit card processing revenues

   • Beginning in May 2015, TAS stopped using the clearing accounts to record deposit activity though the clearing accounts continued to be relieved to record deposits to the TAS operating account and to record cashiering activity; as a result, TAS has generated a large credit balance in the asset clearing account and a large debit balance in the liability clearing account

   • Management indicated they plan on recording a journal entry to offset the balances of the two accounts.

   • The net balance between the two clearing accounts should still represent the net obligation to drivers for credit card receipts not yet presented



# TAS Balance Sheets – Net Credit Card Receipts

- The net balance in the credit card clearing account represents obligations to drivers for credit card receipts not yet presented

- The balance grew through 2013, particularly in May and June 2013, until TAS wrote-off a substantial portion of the balance in December 2013 to collision insurance payable, which had accumulated a large debit balance in the liability account

- Management indicated the write-off pertained to normal accounting clean-up and delayed bookkeeping

| Period | Balance | Period | Balance | Period | Balance |
|--------|---------|--------|---------|--------|---------|
| Dec-12 | $ (50,856) | | | | |
| Jan-13 | 14,595 | Jan-14 | $ (524,910) | Jan-15 | $ (1,439,492) |
| Feb-13 | (1,736) | Feb-14 | (745,073) | Feb-15 | (1,868,109) |
| Mar-13 | 61,004 | Mar-14 | (596,420) | Mar-15 | (3,446,868) |
| Apr-13 | (74,911) | Apr-14 | (880,854) | Apr-15 | (2,587,661) |
| May-13 | (896,232) | May-14 | (1,071,766) | May-15 | (2,400,278) |
| Jun-13 | (1,822,952) | Jun-14 | (776,915) | Jun-15 | (2,682,872) |
| Jul-13 | (2,058,305) | Jul-14 | (1,194,907) | | |
| Aug-13 | (2,071,603) | Aug-14 | (914,395) | | |
| Sep-13 | (2,178,153) | Sep-14 | (1,302,400) | | |
| Oct-13 | (2,254,776) | Oct-14 | (1,765,276) | | |
| Nov-13 | (2,327,146) | Nov-14 | (1,592,949) | | |
| Dec-13 | (575,837) | Dec-14 | (1,572,154) | | |

- TAS generated the large debit balance from actual cash payments of at least $1.4 million to Transit General in May and June 2013, so the reclassification of the credit card clearing credit balance to collision insurance payable essentially represented a cash transfer from credit card proceeds to Transit General without any corresponding income statement effects

- No explanation was readily available from management for the subsequent increase in the credit card clearing accounts through 2014 and in particular the increase in March 2015



## ▶ TAS Balance Sheets – Accounts Receivable

| Accounts Receivable | 2012 | 2013 | 2014 | 30-Jun-15 |
|---|---|---|---|---|
| Misc. Receivables Holding | $ 46,655 | $ 354,961 | $ 436,576 | $ 1,359,076 |
| Revenue Accruals | 506,309 | 646,476 | 675,376 | 680,148 |
| Pace Rebilling | 47,362 | - | 172,190 | 331,022 |
| Mobility Rebilling | (24,850) | (0) | 24,498 | 193,697 |
| Accounts Receivable | 420,116 | 441,631 | 310,019 | 146,912 |
| Charge Ticket Rebilling | 5,543 | 0 | (23,913) | 79,010 |
| NSF Checks | - | - | (26,298) | 32,129 |
| Reimbursable Payments | 505 | - | - | - |
| Pace Settlement 2010 | 5,850 | - | - | - |
| Airline Rebilling | (1,432) | 0 | (385) | (12,037) |
| Allowance for Doubtful Accounts | (15,300) | (14,000) | (30,000) | (30,000) |
| Subtotal | $ 990,758 | $ 1,429,068 | $ 1,538,062 | $ 2,779,957 |

– The increase in the miscellaneous receivables is primarily driven by the accrual of NSF checks received from All City Taxi and the transfer of funds to YCA; activity pertaining to Stick Out Social was also noted

– Most activity in the revenue accrual account pertains to rent accrued and received from Second City Leasing

– The receivables due from PACE and Mobility rebilling represents funds collectable from governmental agencies for ride subsidies TAS already paid out to drivers

– General accounts receivable are corporate accounts with a limited number of customers, in particular some of the airlines



# TAS Balance Sheets – Intercompany and Related Party Receivables

- Net balances were presented though TAS has not officially offset activity between any entities except at the end of 2013 when a general clean-up of the ledger appears to have occurred

- There is extensive intercompany and related party transaction volume conducted by TAS

- Due to the volume of transactions and number of counterparties, the analysis of intercompany and related party transactions was limited to select accounts based on a judgmental determination of relevance

| Net Receivable (Payable) | 2012 | 2013 | 2014 | 30-Jun-15 |
|---|---|---|---|---|
| Taxi Medallion Management | $ (7,341,931) | $ - | $ (1,927,245) | $ 13,086,269 |
| Yellow Medallion Holdings, LLC | 8,706,699 | 10,675,522 | 9,268,347 | 9,268,597 |
| American United | 3,097,505 | 3,870,891 | 4,038,269 | 4,371,603 |
| Checker Taxi Affiliation | 5,504,122 | 6,829,156 | 6,249,258 | 1,034,125 |
| CL Medallion Holding, LLC | (475,975) | 623,047 | 649,635 | 649,635 |
| Transit Financial | 654,206 | 505,205 | 510,404 | 450,326 |
| Due from Baltimore | - | - | 504,546 | 253,689 |
| Taxi Works | 7,126,946 | - | 339,435 | 222,714 |
| American Resources | 338,562 | 338,562 | 338,562 | 188,562 |
| Metro Cabs 1, LLC | 851,626 | - | 104,960 | 175,290 |
| Taxi Affiliation Services | - | - | - | 25,000 |
| Blue Diamond | (253,953) | (41,854) | (21,130) | 22,031 |
| Gemini | (460) | 1,405 | 1,601 | 1,601 |
| Dimension Group | 21,851 | - | 394 | 644 |
| Taxi Vehicle Leasing | - | - | - | 250 |
| Yellow Group, LLC | 1,729,122 | (25,380,945) | - | - |
| Transit Fuel Holdings | 523,577 | 0 | (7,510) | (7,424) |
| Due To Transit Funding | (66,938) | - | (218,169) | (136,489) |
| Yellow Services | (6,829) | (165,256) | (163,175) | (163,175) |
| Due to Second City Leasing | 19,273 | 25,399 | (219,918) | (195,366) |
| Due From TMM Realty | 160,646 | 124,074 | (335,365) | (336,443) |
| Yellow Cab Affiliation DIP | - | - | - | (579,537) |
| Yellow Cab Affiliation | 6,698,938 | 8,823,019 | 7,310,794 | (2,172,857) |
| Metro Yellow Northwest | 1,880,463 | - | - | - |
| Lake County Transportation | 429,298 | - | - | - |
| Metro Yellow | 128,763 | - | - | - |
| Metro Yellow North Chicago | (30,704) | - | - | - |
| Metro Central | (82,217) | - | - | - |
| Subtotal | $ 27,286,987 | $ 6,228,226 | $ 26,423,693 | $ 26,159,045 |



# TAS Balance Sheets – Intercompany and Related Party Receivables

***Taxi Medallion Management***

— The TMM receivable was primarily driven up in 2015 from the reversal of $14.3 million in affiliation dues recorded by TAS as being between TMM and the affiliations, but which were reclassified to be between TAS and the affiliations and between TAS and TMM, with an entry made as of January 1, 2015.

— TAS also made cash transfers to TMM of $4.2mm that increased the receivable

— The only reduction to the receivable came from a reclassification to accrued expenses; TAS made a $300k payment in 2014 to Michael Levine to reimburse him for registration fees paid on his credit card

— The elimination of the TMM balance at December 31, 2013 was part of the overall clean-up entries recorded at year-end

***Yellow Medallion Holdings ("YMH")***

— As discussed in more detail later, substantial activity relating to the repayment of bank debts from medallion sales was recorded through the intercompany receivable due from YMH

— Interim activity other than medallion sales related primarily to the payment of annual report and registered agent fees, though it was noted in May 2014 that 10 $20k cashier's checks for a total of $200k were withdrawn from the TAS operating account and recorded as a receivable due from YMH



# ▶ TAS Balance Sheets – Intercompany and Related Party Receivables

### *Checker Taxi Affiliation*

– Most activity relates to the movement of funds to Checker for disbursements made directly by Checker

– An entry dated January 1, 2015 reduced the receivable by $5.3 million for affiliation dues 2011-2013 that were previously recorded against TMM to reflect affiliations dues owed to Checker previously not recorded by TAS

– TAS also made cash transfers to TMM of $4.2mm that increased the receivable

– The only reduction to the receivable came from a reclassification to accrued expenses; TAS made a $300k payment to Mike Levine to reimburse him for registration fees paid on his credit card

– The elimination of the TMM balance at December 31, 2013 was part of the overall clean-up entries recorded at year-end

### *Taxi Works*

– The elimination of the intercompany receivable due from Taxi Works at the end of 2013 was part of the overall general ledger clean-up, with the net expense recorded as "Organization Costs"

### *American Resources*

– Related party insurance brokerage owned by Transit Financial.  American Resources is the broker of record for all of the collision insurance policies

– TAS loaned American Resources the money for them to purchase their software systems, and TAS was just repaid earlier in 2015



## TAS Balance Sheets – Intercompany and Related Party Receivables

***Taxi Affiliation Services***

– The balance owed to TAS from Taxi Affiliation Services is a likely clerical error that will likely be written-off in the future, as obviously TAS cannot owe a balance to itself

***Yellow Group***

– The activity in the Yellow Group receivable reflects the movement of loan repayments on the medallion loans; in 2014 the remaining payable owed to Yellow Group was reclassified as an investment in Yellow Group.  See page 90 for further explanation.

***Transit Fuel Holdings***

– The overall organization used to operate multiple gas stations in the City but is currently only operating one gas station flagged as a Marathon; Transit Fuel was the holding company for the entities that owned the individual stations

– Activity is substantially reduced from prior years

– The elimination of the receivable in 2013 was a part of the overall general ledger clean-up with the net income statement effect being recorded as "Organization Costs"



## TAS Balance Sheets – Intercompany and Related Party Receivables

***Yellow Cab Affiliation DIP***

– TAS maintains two clearing accounts to record activity with the post-petition YCA entity; the asset intercompany account reflects payments made to and from YCA, and the liability intercompany account reflects affiliation dues collected by TAS on behalf of YCA

– The intercompany balances between TAS and the post-petition YCA do not agree and are different by a net $448k

– See page 69 for further details

***Yellow Cab Affiliation***

– TAS maintains separate general ledger accounts for its transactions with the pre and post petition YCA entities.  However, the intercompany balances do not agree and require further reconciliation.

– Due to the complexity of the accounting and nature of the post-transaction reconciliation process, it was noted that certain entries were made substantially after the petition date.  For example, all affiliation dues owed to the post-petition YCA were recorded in a single entry dated as of June 30, 2015 and entered in November 2015.



## TAS Balance Sheets – Accrued Expenses, Cashiering Clearing and Other Liabilities

– Accrued expenses declined significantly from 2012 to 2015, primarily due to the reclassification of insurance reserves from TAS to YCA as part of the account closing process performed in early 2015 and related to the recording of the insurance proceeds originally received in 2013

– Cashiering clearing had relatively negligible unbalanced activity through 2013 and netted to zero in every month in 2014 and through February 2015.  Beginning in March 2015, TAS began accumulating a significant liability in the cashiering clearing account (G/L 90000) primarily from:

- All City Taxi ("ACT") dues of $1,662,520

- TMM fees of $950,040

– Management indicated the TMM fees also related to ACT.  TAS previously collected funds from ACT, the sub-manager for TMM, outside of the cashiering system but then deciding to post ACT activity through cashiering.

– Other liabilities predominately represent security deposit obligations of TAS received from drivers and medallion owners to guarantee weekly payments.  The large decrease appears to be driven from the usage of security deposits to apply towards weekly fees.  At June 30, 2015 recorded a large $1.5 million reduction in security deposits through the cashiering process to apply to customer obligations.

– It is possible that the ACT fees were debited out of the security deposit liability, while the payments were generating large credits in the cashiering clearing account, and that to balance the cashiering clearing account, TAS will need to credit the security deposit account.  Management was still researching.



▶ TAS Balance Sheets – Debt Obligations

| Debt | 2012 | 2013 | 2014 | 30-Jun-15 |
|---|---|---|---|---|
| North Fork Bank | $ 24,652,262 | $ 1,671,851 | $ - | $ - |
| Cole Taylor | - | - | 2,950 | 2,950 |
| Capital One | 5,635,340 | - | - | - |
| Loan from TPA account | 375,000 | 375,000 | 375,000 | 355,000 |
| Loans Due to Mike Levine | 631,798 | 3,089,461 | 3,089,461 | 3,089,461 |
| Loans Due to Patton Corrigan | 838,199 | 3,058,167 | 3,058,167 | 3,058,167 |
| Transit Funding Associates | - | 78,433 | 78,433 | 78,433 |
| Subtotal | $ 32,132,598 | $ 8,272,913 | $ 6,604,011 | $ 6,584,011 |

– North Fork Bank is a predecessor of Capital One Bank though it is recorded separately in the general ledger

– As discussed on page 90, entities affiliated with Michael Levine and Patton Corrigan sold 500+ taxicab medallions between 2012-2014 to pay down debt associated with the medallion loans. The loans were recorded on the books of TAS, but it is unclear who the legal obligor was. Management indicated neither YCA nor any of the other affiliations were ever guarantors on the loans, but declined to provide any further information regarding the medallion sale or debt repayment transactions.

– Upon receipt of proceeds from medallion sales, the bank debt was paid down outside of TAS (likely at Yellow Medallion Holdings) with the TAS liability transferred to a related party liability due to Yellow Medallion Holdings and later to Yellow Group. The final loan payment was made on October 1, 2014. Ultimately, the liability of TAS to Yellow Group was re-characterized as an investment in Yellow Group

– The loan from the TPA account originated prior to the receipt of the $4.9 million payment from Pacesetter. Management is still researching the origin of this payable.

– Loans due to Levine and Corrigan largely increased in 2013 and the entries do not indicate the exact purpose for the funds, but some descriptions suggest payments were made to cover insurance expenses, for payments related to Transit Funding, Second City Leasing and Capital One and others



## TAS Balance Sheets –Equity

– Retained earnings has decreased from 2012-2015 as TAS has recorded net losses in each year and for the first half of 2015.

– As a result of the re-characterization of the $25.4 million payable due to Yellow Group as an equity investment in Yellow Group, overall equity in TAS increased significantly in 2014



# TAS Income Statements

- TAS has recorded net losses in 2013, 2014 and the first half of 2015

- TAS primarily earns revenues from providing credit card servicing to drivers and medallion owners

- In 2013, TAS recognized service agreement fees from each affiliation but discontinued that practice in 2014

| Taxi Affiliation Services Inc. | 2013 | 2014 | 1H2015 |
|---|---|---|---|
| Credit card revenues | $ 3,179,639 | $ 3,934,118 | $ 2,120,511 |
| Service agreement fees | 4,714,157 | - | 61,146 |
| Allocation fees | 520,560 | 520,560 | - |
| Other revenue | 541,576 | 206,902 | 59,866 |
| Total revenues | 8,955,932 | 4,661,580 | 2,241,523 |
| | | | |
| Owners fees | 1,346,000 | 1,732,057 | - |
| Credit card fees | 3,018,357 | 4,113,775 | 2,191,148 |
| Officer and general salaries | 2,203,856 | (120,030) | (193,127) |
| Insurance expense | (116,955) | - | - |
| Miscellaneous | 4,687,595 | 252,360 | 350,626 |
| Organization fees | 608,257 | - | - |
| Total expenses | 11,747,111 | 5,978,161 | 2,348,647 |
| | | | |
| Net profit (loss) | $ (2,791,180) | $ (1,316,581) | $ (107,124) |

- The service agreement fees in 2015 relate to YCA but appear to be mistaken entries requiring correction

- Allocation fees are recognized for services provided to Transit Financial, Second City Leasing and Baltimore; no fees were recognized in 2015 but are likely to be recognized later in the year when TAS fully reconciles and closes all relevant general ledgers

- Credit card fees represents processing costs charged to TAS from merchant providers



## TAS Income Statements – Owners Fees

- TAS made regular monthly payments to entities affiliated with both Mike Levine and Pat Corrigan throughout 2013 and through October 1, 2014

- In 2013, TAS accrued management fees to entities affiliated with Michael Levine and Patton Corrigan at $108,000 and $92,000 per month, respectively

- In 2014, TAS accrued management fees to Michael Levine and Patton Corrigan at $99,360 and $84,640 per month, respectively

- Some of these accruals were later reversed such that net expense recognized and paid was $1.3 million and $1.7 million in 2013 and 2014, respectively

- The expense for owners fees recorded in 2014 was not allocated to the individual affiliations

- In addition to management fees paid to entities affiliated with Levine and Corrigan, these entities and/or Levine individually also received travel reimbursements or had TAS cover certain expenses related to their corporate involvement

  - Approximately $27k was paid to Lower Cross Aircraft for private jet travel; it is believed Lower Cross Aircraft is a related-party in that it is controlled by Patton Corrigan

  - Approximately $15k was paid to Michael Levine to reimburse travel expense



# TAS Income Statements – Officer and General Salaries

– Though the general ledger account is titled "Officers Salaries" the account actually represents all payroll expenses for the entity.

– In 2013, TAS absorbed the full cost of payroll and had the service agreement fees to provide the revenue sufficient to make payments

– TAS began allocating its payroll costs to the various affiliations in 2014 with the verbal amendment to the services agreements with the affiliations

- Certain adjustments are made to the payroll to reflect John Moberg's salary and benefits being paid out of Checker, resulting in an allocation in excess of the amount actually recognized by TAS on its own payroll.

- In 2014, total payroll expense was $2.1 million but the allocated payroll expense was $2.6 million

- For the first half of 2015, total payroll expense was $1.1 million but the allocated payroll expense was $1.3 million

- Other differences relate to end-of-period accruals



## TAS Income Statements – Other Expenses and Organizational Costs

– Normal operating costs were recognized by TAS in 2013 and allocated to the affiliations in 2014 and for the first half of 2015

– Certain expense were not allocated:

- Credit card processing costs

- Legal fees

- Internet costs

- Owners management fees

- Other miscellaneous like penalties, fines, fees, permits, licenses etc.

– TAS recognized $608k in expense labelled in the general ledger as "organizational costs" in 2013. This represented the net write-off resulting from the clean-up of the general ledger at that time, as TAS offset various intercompany and related party receivable and payable accounts and wrote-off unreconciled balances.  Management indicated this was classified as a bad debt expense for income tax reporting purposes



# TAS Involvement in Medallion Sales

Levine and Corrigan declined to provide detailed information supporting the series of transactions involving TAS and the sale of medallions owned by entities affiliated with Levine and Corrigan over the prior several years.  An analysis of the general ledger activity has identified the following:

— Medallion sales occurred from 2012-2014 and it appears the funds did not flow through TAS; if entities affiliated with Levine and Corrigan sold approximately 540 medallions at an average price of $300-$325k per medallion based on average sales prices at that time, they would have realized gross proceeds of $160-$175 million

— At least a portion of the debt associated with the medallions was recorded on the TAS financial statements with approximately $30.1 million owed to Capital One Bank at year-end 2012; management has indicated neither YCA nor any of the other affiliations have ever been guarantors on the loans

— During 2013 and 2014, the entire debt was repaid and generally reclassified as a payable to Yellow Medallion Holdings instead of to the bank counterparties, with the final loan payment being recorded as of October 1, 2014

— An entry dated Dec 31, 2013 labeled as "WG FINAL ENTRY" transferred a $25.4 million liability owed to Yellow Medallion Holdings to an intercompany liability owed to Yellow Group LLC.  An entry dated Dec. 31, 2014 converted the liability owed to Yellow Group LLC as an investment in Yellow Group by its members instead.

— Interim entries suggest the allocation of the capital contribution was divided between Mike Levine and Pat Corrigan in a 54/46 split, representing contributions of $13.7 million and $11.7 million, respectively

— The only remaining debt noted within the Yellow Group is the vehicle obligations owed to All Points

▶ Section VIII – Reporting Issues and Claims





# Bankruptcy Reporting

- YCA has amended original schedules and filed supplemental reports; the updated reporting does not appear to be a function of YCA filing deliberately misleading information but rather of generating reporting based on preliminary, incomplete and inaccurate accounting records

- As TAS continues completing the process of recording accounting transactions and reconciling activity, additional updates or corrections will be necessary

- The Examiner did not audit the actual Court submissions, but notes that it believes based on its review that the submissions represent good faith efforts to provide accurate information and the debtor is not intentionally filing incorrect data

- YCA is struggling with the additional volume of financial reporting necessary to meet Court requirements; the organization had already placed accounting records and standard financial reporting in a secondary position internally such that information was routinely prepared after the fact, and the additional burdens of bankruptcy reporting has further strained the organization

- Intercompany balances in particular are sensitive to reconciling adjustments as TAS completes internal evaluations of individual entity accounting records; a review of YCA on a standalone basis may not identify all necessary entries as they may have been inadvertently made at other entities or other entity activity may impact that of YCA

- The existing reporting will need to be corrected as at the least the intercompany receivable and payable accounts between YCA and TAS do not appear to be fully reconciled as of November 23, 2015



## ▶ Creditor Concerns

– The Unsecured Creditors Committee has communicated several areas of concern, which were addressed in this report.  In particular, the UCC asked about:

- Validity of the receivable due from TMM to YCA: the correction by YCA appears to be legitimate, though the overall accuracy of any related party receivable or payable is still subject to correction due to the issues present in the accounting records

- Details of medallion ownership and YCA's role: Management largely declined to provide detailed information regarding the ownership and sale of medallions, but the Examiner did not find any evidence that YCA ever directly owned or was involved in the transactions involving the purchase or sale of medallions

- Excess/umbrella insurance: YCA has always provided statutorily-required insurance coverage to its members, believed the affiliation was not liable for actions of independent contractors, and made a business decision not to purchase additional insurance coverage for YCA

- Organizational structure: current ownership acquired the operations of YCA and related parties in or around 2006 and began implementing operational and organizational changes at that time

- Receivables due from Khaled Mahmoud: this obligor is a large fleet operator that acquired numerous medallions and began experiencing financial distress.  YCA properly wrote-off the balance owed and likely should write-off the remaining balance as Mahmoud filed for bankruptcy protection in October 2015

- Intercompany and related party receivables: transactions between entities are voluminous, and combined with the inability of TAS to maintain accurate and timely accounting, numerous restatements have been made and it is believed additional restatements are necessary

▶ Section IX – Appendices





## ▶ Appendix List

Appendix I – Order Appointing Examiner

Appendix II – Sample Affiliation Agreement

Appendix III – Cash Flowcharts

Appendix IV – YCA-TAS Services Agreement

Appendix V – List of Entities

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re: | ) | BK No.:   15-09539 |
| Yellow Cab Affiliation, Inc., | ) | |
| | ) | Chapter:  11 |
| | ) | Honorable Carol A. Doyle |
| | ) | |
| | ) | |
| Debtor(s) | ) | |

## ORDER APPOINTING EXAMINER

This matter coming on to be heard on the Unsecured Creditors' Committee's ("Committee") Motion For the Appointment of an Examiner (the "Motion") and with agreement of Yellow Cab Affiliation, Inc. (the "Debtor"); due and adequate notice of the Motion having been given to all parties entitled thereto; the court having considered the Motion and  the statements of counsel with respect thereto; all objections to the relief requested in the Motion having been withdrawn or overruled; and the court ("Court") having determined that the appointment of an examiner ("Examiner") is in the best interests of the debtor's ("Debtor's") creditors, equity security holders, and other interests of the Debtor's estate; and the Court being fully advised in the premises;

NOW, THEREFORE, THE COURT ORDERS AS FOLLOWS:

The United States Trustee is hereby directed to appoint an Examiner under section 1104(c) of the Bankruptcy Code (the "Bankruptcy Code") on the following terms and conditions:

I. Scope of Investigation

A. The Examiner shall investigate (a) any and all relationships and transactions between the Debtor and the entities listed on Exhibit "A" hereto (the "Affiliates"), and (b) the structure of the Debtor's overall business enterprise with the Affiliates.  As part of that investigation, the Examiner may consider the following:

1. whether the Debtor is paying a fair market price for the goods and services provided to it by the Affiliates or is otherwise receiving reasonably equivalent value for payments made for such goods and services;

2. whether the Debtor is currently being mismanaged and whether the Debtor's management has committed corporate waste;

3. whether the Debtor is complying with the terms of its agreements with the Affiliates;

4. whether the Debtor's post-petition payments to Affiliates leave the Debtor's bankruptcy estate with insufficient cash with which to fund ongoing operations and to pay expenses of administration;

5. the business relationship between the Debtor's medallion-owner/members (the "Members") and the Affiliates;

6. (a) the value and collectability of Debtor's accounts receivable from Chicago Taxi Medallion Management, Inc. and Taxi Medallion Management LLC (the "Accounts Receivable"); (b) how those Accounts Receivable arose; (c) when the Debtor knew or should have known that the Accounts Receivable might be uncollectable; (d) the efforts, if any, undertaken by or on behalf of the Debtor to collect the Accounts Receivable; (e) the Debtor's decision to continue doing business with Taxi Medallion Management, Inc. and Taxi Medallion Management, LLC after the Accounts Receivable became more than 90 days past due; and (f) the involvement of any insider (as defined in section 101 (31) of the Code) of either or both of Taxi Medallion Management, Inc. and Taxi Medallion Management, LLC in any decision of the Debtor regarding (i) collection efforts relating to the Accounts Receivable and (ii) the Debtor's continued provision of services to Taxi Medallion Management, Inc. and Taxi Medallion Management, LLC after each of the Accounts Receivable became more than 90 days past due;

7. (a) the basis and validity of the claims of Taxi Affiliation Services, LLC, Taxi Works, LLC, American United Taxi Affiliation, Inc., Wolley Cab Association, Inc., Metro Cabs 1 LLC and Blue Diamond Taxi Association, Inc. identified on Schedule F of the Debtor's Schedules, as amended, and (b) the reason for the omission of those claims from the Debtor's Schedule F as originally filed;

8. whether Taxi Affiliation Services LLC has a valid right of setoff against the Debtor in the amount of $140,761.08.

9. (a) whether the Debtor (i) made transfers or incurred obligations to the Affiliates, or (ii) engaged in other transactions (such as the creation of the existing corporate structure and out-sourcing services to the Debtor's Affiliates), that might be avoided as preferences or fraudulent transfers (both intentional and constructive), (b) the dates when the Debtor established business relationships with each of the Affiliates and (c) whether the Debtor has other valid and enforceable claims against the Affiliates;

10. whether the Debtor has fully complied with its disclosure obligations under the Bankruptcy Code, Bankruptcy Rules, and other applicable law;

11. whether the Debtor's relationship with one or more Affiliates provides grounds for substantively consolidating the Debtor with those Affiliates;

B. If any party in interest concludes that the scope of the Examiner's investigation should be expanded, such party in interest may file a motion on notice to parties entitled thereto to modify the order appointing the Examiner.

II. Examiner's Professionals

A. The Examiner shall have the right, subject to this Court's order, to retain professionals under section 327(a) of the Bankruptcy Code.

B. The Examiner and any professionals whom the Examiner retains will be compensated in accordance with Bankruptcy Code section 330(a).

### III. Examiner's Budget

A. The Debtor, the Committee and the Examiner shall develop a budget for the Examiner's investigation (the "Budget"). Within fourteen (14) days after the Court's entry of the order appointing the Examiner, those parties shall submit, and request Court approval of, that Budget provided, however, that the Examiner may submit its own Budget to the Court if the Examiner cannot agree with either or both of the Debtor and the Committee on the Budget. The Examiner and any professionals whom the Examiner retains will not incur fees or expenses in excess of 105% of the Budget.

B. After the beginning of its investigation, the Examiner may seek Court approval of an amended Budget.

### IV. Examiner's Report

A. The Examiner shall file its final report on or before the 60th day following entry of the order appointing the Examiner.

B. The Court may extend the deadline for filing of the Examiner's final report at the request of the Examiner and upon a showing a good cause.

### V. Term of the Examiner's Appointment

A. Unless extended by the Court, the Examiner's appointment shall continue until the first to occur of the conclusion of any hearing on the Examiner's report or entry of an order terminating the Examiner's appointment.

### VI. Discovery and Privilege Issues

A. The Examiner is authorized, without further order of court, to take discovery (including electronic discovery) under Bankruptcy Rule 2004 of the Debtor or any other person or entity through the issuance of subpoenas under Rule 45 of the Federal Rules of Civil Procedure (made applicable to this case by Bankruptcy Rule 9016). The Court will address discovery disputes, including, without limitation, disputes regarding privilege issues, in accordance with Rule 45 and the Federal Rules of Evidence.

B. The Examiner and any professionals whom the Examiner retains shall execute and agree to be bound by that certain Stipulated Protective Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Establishing Procedures for the Protection of Confidential Information Provided by the Debtor to the Official Committee of Unsecured Creditors (the "Protective Order").

### VII. Cooperation

The Debtor, the Affiliates and the Committee shall cooperate fully with the Examiner in connection with the investigation and the performance of the Examiner's duties. Such cooperation includes, without limitation, the prompt production of non-privileged documents and information requested by the Examiner, subject to the right of the party producing such documents to raise objections. In addition to the Protective Order, the Examiner is authorized to execute other agreed protective order(s) applicable to a party in interest's documents.

VIII. Coordination

A. Before commencing its investigation, the Examiner shall meet and confer separately with each of the Debtor and the Debtor's professionals, the Committee's professionals, the Affiliates and its professionals, the equity holders and its professionals, the U.S. Trustee, and any other party in interest who has appeared in the case and who wishes to participate in such a meeting.

B. During the term of the Examiner's appointment, the Committee shall temporarily suspend its investigation of any matter within the scope of the Examiner's investigation. Such suspension shall not prevent the Committee and its counsel from (1) cooperating with the Examiner, (2) attending meetings between the Examiner and other entities, if requested by the Examiner, (3) attending hearings relating to the Examiner and the Examiner's investigation, including, without limitation, (a) the appointment of the Examiner, (b) the Budget (including any amendment to the Budget), (c) the Examiner's investigation, (d) the Examiner's report, and (e) the extension or termination of the Examiner's appointment, and (4) initiating or continuing investigation(s) of matters outside the scope of the Examiner's investigation to the extent such investigations are reasonable under the circumstances, (5) prosecuting or defending any pending motions, including, without limitation, (a) the pending motions to compel discovery from the Debtor and the Affiliates and to prohibit transfers to insider or (b) other motions, (6) reviewing documents relating to the scope of the Examiner's investigation, as set forth in Paragraph I of the Order, if requested by the Examiner, and (7) discharging the Committee's statutory duties set forth in the Code, except to the extent such duties fall within the scope of the Examiner's investigation as set forth in Paragraph I of this Order.

C. At the request of the Examiner, counsel for the Committee, the Debtor, the Affiliates, and any interested creditor may attend and/or participate in any depositions conducted by the Examiner.

D. Except as otherwise provided herein, nothing contained in this Order shall diminish the powers and authority of either the Debtor or the Committee under either or both of the Code and the Bankruptcy Rules.

IX. Standing

The Examiner shall be entitled to appear and be heard at any and all hearings in the case.

X. Notification to the Court

Nothing in this Order shall limit the rights of the U.S. Trustee, the Debtor, the Committee, or any other party in interest, to (1) request any other relief, including but not limited to, a request to expand the scope of the Examiner's investigation if, during such investigation, other matters are revealed which the Examiner or any other party in interest believes should be brought to the attention of the Court, and (2) to request that the Examiner's report (or parts thereof) be filed under seal.

Enter:

Dated:   9/10/15

Prepared by:

United States Bankruptcy Judge

Matthew T. Gensburg (ARDC # 6187247)
DALE & GENSBURG, P.C.
200 West Adams Street, Suite 2425
Chicago, Illinois 60606
Phone:  312-263-2200
Fax:  312-263-2242
mgensburg@dandgpc.com

Nancy A. Peterman (ARDC # 6208120)
Martin S. Kedziora (ARDC # 6300162)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois  60601
(312) 456-8400
(312) 456-8435 (fax)
petermann@gtlaw.com
kedzioram@gtlaw.com

# EXHIBIT A

1. Taxi Affiliation Services, Inc.;
2. Yellow Group LLC;
3. Taxi Medallion Management LLC;
4. PeopleMover, Inc.;
5. Yellow Cab Partners LLC;
6. Transit General Insurance Co.;
7. Taxi Works LLC;
8. Transit Funding Associates LLC;
9. Transit Funding Associates 2 LLC;    } Financing
10. Transit Funding Associates 3 LLC;
11. Transit Funding Associates 4 LLC;
12. Transit Funding Associates 5 LLC;
13. Transit Funding Associates 6 LLC;
14. Chicago Taxi Medallion Management, Inc.;  - unrelated
15. American United Taxi Affiliation, Inc.;
16. Blue Diamond Taxi Association, Inc.;
17. Metro Cabs 1 LLC;
18. Illinois Transportation Trade Association Ltd.;  - unrelated; John current President
19. First Chicago Insurance Company;  - unrelated
20. McClure & Associates;  - unrelated - insurance broker
21. American Resources Insurance Agency LLC.

## YELLOW CAB AFFILIATION, INC.
## <u>TAXICAB AFFILIATION AGREEMENT</u>

THIS TAXICAB AFFILIATION AGREEMENT (the "Agreement") is made as of the date set forth below between the person or entity identified as "Licensee" on the signature page hereof, whose address is set forth thereon ("Licensee"), and YELLOW CAB AFFILIATION, INC., an Illinois corporation, whose address is 3351 W. Addison, Chicago, Illinois 60618 ("Affiliation").

### W I T N E S S E T H:

WHEREAS, Affiliation, a taxicab affiliation, has certain protectable property interests in, or exclusive rights to use and sublicense, the trade name "Yellow Cab Affiliation", the service marks "Yellow Cab" and "Yellow" (the trade name and service marks are collectively known herein as the "Insignia"), and its color scheme (the "Colors") as both are displayed on taxicabs of Affiliation's members;

WHEREAS, Affiliation also has access to comprehensive vehicle maintenance and insurance programs, as well as a radio dispatch network to use in connection with its business; and

WHEREAS, Licensee desires to use the Insignia, Colors and all or part of the insurance programs, and cab service programs of Affiliation, and Affiliation is willing to grant to Licensee a non-exclusive License to do so as a member of its affiliation, but only upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements and obligations contained herein, the parties agree as follows:

1.      <u>Conditions.</u>

On the date hereof and throughout the term of this Agreement, Licensee must be in compliance with the following terms and conditions and shall provide satisfactory evidence to Affiliation of such compliance:

     a.      Licensee must be a public passenger vehicle license holder and have valid legal title to, or valid leasehold interest in, the vehicles that it will use as Taxicabs (as defined below) under this Agreement;

     b.      Licensee will covenant and undertake to ensure that all of Licensee's agents who operate Taxicabs under this Agreement (i) will have a valid chauffeur's license from the City of Chicago, (ii) have a valid driver's license from the State of Illinois, and (iii) be at 23 years of age with a driving record acceptable to the Affiliation's insurance carrier at the time of their contracting with Licensee as agent Taxicab operators under this Agreement;

     c.      The City of Chicago shall have affixed the medallion, as defined under Chapter 9 of the Chicago Municipal Code, bearing the Public Passenger Vehicle License Number (s) set forth on the signature page hereof (or any substitute or replacement number (s) or other indicia therefor) (the "Medallion") to the hood of Licensee's vehicles;

     d.      Licensee shall have provided Affiliation with (i) information regarding the year and model of Licensee's vehicles, (ii) the vehicle identification number of such vehicle and (iii) proof that Licensee is a duly qualified owner of such vehicles or a lessee thereof in accordance with applicable provisions of the City of Chicago Municipal Code, the rules and regulations promulgated thereunder, and any State of Illinois laws, rules or regulations governing the operation of taxicabs;

     e.      Licensee shall (i) paint its vehicles in the Colors and Insignia of the Affiliation, (ii) equip its vehicles with the radio dispatch equipment required by the Affiliation and (iii) not place any advertising or other markings on or in its vehicles which has not been authorized or otherwise approved by the Affiliation in its sole discretion;

     f.      In the case of agent drivers, Licensee shall ensure and provide evidence satisfactory to Affiliation that such agent drivers: (i) meet the standards set forth in subparagraph (b) of this Paragraph, (ii) are in good standing as licensed chauffeurs and not subject to any proceeding to suspend or revoke such license, (iii) have executed lease agreements with Licensee complying in all respects with the provisions of the City of Chicago Municipal Code (and, if required by law, in the form adopted and provided by the Affiliation), together with a pre-lease "Acknowledgment of Public Chauffeur Responsibilities" in form acceptable to and approved by the City of Chicago Department of Consumer Services, and (iv)

1

are otherwise acceptable to act as agent drivers as determined by Affiliation, in its sole discretion;

g. All of Licensee's agent drivers shall have (i) completed Personal Resumes including all supplements and amendments thereto (collectively, "Personal Resume") as required by Affiliation and (ii) executed, together with Licensee, and delivered to the Affiliation, an "Agreement and Acknowledgment of Responsibilities between Public Chauffeur, Taxicab Licensee and Affiliation", in form acceptable to and approved by the City of Chicago Department of Consumer Services; and

h. All of Licensee's agent drivers shall be in compliance with all rules and regulations of the City of Chicago, Department of Consumer Services, in force from time to time relating to the good standing of the chauffeurs driving Licensee's Taxicab and shall present proof, if required, that such drivers are not subject to any pending proceedings to suspend the license of such driver;

The word "Taxicab" means a vehicle of Licensee for which Licensee has satisfied the conditions set forth in subparagraphs a, b, c, d and e of this Paragraph 1. The phrase "Licensee's agent" or "agent driver" shall be deemed to include Licensee to the extent Licensee is an individual and drives the Taxicab.

2. Term.

Subject to Paragraph 10 hereof, the term of this Agreement shall commence upon the later of (a) the date set forth at the head of this Agreement, or (b) the date on which Licensee has fulfilled all of his obligations pursuant to Paragraph 1 (i.e: the hard card date), and shall expire on the date set forth as the "Expiration Date" on the signature page hereof. This Agreement will automatically renew for successive one year terms thereafter, unless either party notifies the other at least 35 days before the end of the initial term or any renewal term of its intention not to renew.

3. Fees.

Licensee shall pay to Affiliation a weekly (or monthly if specified by the Affiliation) affiliation fee for the term of this Agreement in an amount specified in Exhibit A - Schedule Of Current Charges (the "Payment Schedule"), payable on the day of the week (or month, if applicable) specified by the Affiliation and subject to adjustment as hereinafter provided. Affiliation may charge Licensee a late fee on all payments not made on the due date thereof of up to $10 per day multiplied by the number of days the delinquency continues. In addition, Licensee shall pay to Affiliation a one-time, refundable security deposit in the amount specified in the Payment Schedule. Affiliation reserves the right to (a) increase the amount of the security deposit upon 30 days notice to the Licensee and (b) adjust the weekly affiliation fee payable under this Paragraph to reflect increases in insurance premiums, City of Chicago fees, or administrative costs after providing written notice of such adjustment to Licensee 35 days prior to the end of any calendar year during the term of this Agreement. In the event that any tax is levied or assessed on the transactions contemplated herein or on any fees payable hereunder, Licensee shall pay all such taxes.

4. Colors and Insignia.

For the term of this Agreement, and subject to the provisions hereof, Affiliation grants Licensee a non-exclusive license to:

a. Paint Licensee's Taxicab in the Colors; provided, however, that Affiliation shall have final approval regarding shade and/or tone of the Colors on the Taxicab; and

b. Display Affiliation's Insignia on the Taxicab in such forms and locations as Affiliation shall approve.

Licensee recognizes and accepts that the Colors and the Insignia are the sole and exclusive property of Affiliation and/or its licensor, made available to Licensee only in accordance with the terms and provisions hereof. Licensee hereby acknowledges the validity of the Colors and Insignia as the respective trademark and trade name of Affiliation and/or its licensor. Licensee agrees that the standard of services and quality provided in connection with the Colors and Insignia shall be at least equivalent to those adopted or used by Affiliation with respect to the Colors and Insignia. To insure the maintenance of such standards and quality, Affiliation shall have the right to investigate, from time to time, the operations and Taxicab of Licensee, and Licensee shall cooperate with Affiliation in making such investigations and shall make available to Affiliation such information and records as Affiliation shall reasonably request in connection with Affiliation's efforts to maintain such standards of quality. If, in the sole discretion of Affiliation, such standards or quality

are not being maintained by Licensee, Affiliation may terminate this Agreement as provided in Paragraph 10.m hereof.

Licensee shall have no right or expectation to make use of either the Colors or the Insignia in any manner not authorized by this Agreement or following the expiration or termination of this Agreement for any reason. Immediately following such termination, Licensee shall, at Licensee's own expense, cause the removal of both the Colors and Insignia from Licensee's Taxicab. Should Licensee continue to make use of the Colors and/or the Insignia following the expiration or termination of this Agreement, then in such event Affiliation shall have available to it all remedies for trademark/trade name infringement, including without limitation, any injunctive or monetary relief necessary to protect Affiliation's rights and interests hereunder (which remedies shall be in addition to any other remedies or damages (whether liquidated or otherwise) which the Affiliation may be entitled to under Paragraph 10 hereof as a result of the termination of this Agreement). In particular, Licensee recognizes that any use of the Colors, Insignia or both in violation of the terms of this Agreement will cause Affiliation an irreparable injury and that injunctive relief is the only appropriate remedy to prevent continuing injury to the Affiliation arising from such unauthorized use. Licensee agrees to reimburse Affiliation for any costs and expenses, including reasonable attorney's fees, incurred by Affiliation in enforcing its rights in accordance with the terms of this Agreement. The rights of the Affiliation under this Paragraph 4 shall survive the termination or expiration of this Agreement.

5.    Eligibility for Maintenance Program.

Affiliation shall make arrangements necessary to permit Licensee to participate in any programs which are made available from time to time by the Affiliation to its members for maintenance and repair of the Licensee's Taxicab or for routine service and repair of the Licensee's radio dispatch equipment, in each case for such period of time as such program remains available to the members at the option of the Affiliation and at the fees posted from time to time at the Affiliation's applicable repair and installation sites.

6.    Affiliation Services.

Affiliation shall make the following services available for Licensee's benefit and use:

a.    Affiliation's radio dispatch system with Gandalf equipment or such other equipment required from time to time by the Affiliation.

b.    Free cab washes at the Affiliation's and other authorized facilities for so long as those facilities are maintained by or otherwise made available to the Affiliation; and discounted cab washes at participating vendors pursuant to programs which may be available under Paragraph 5 above.

c.    Affiliation's "lost and found" claim facility for passenger items left in Licensee's Taxicab.

d.    Authorization to provide service to qualified charge account customers.

e.    Authorization to accept as payment cab coupons, vouchers, and credit or debit cards as approved and designated by the Affiliation or the City of Chicago, and the ability to process such approved credit and debit cards with the necessary equipment to be provided by the Affiliation, subject to the processing and handling fees of the Affiliation and third party providers.

f.    Licensee shall be eligible to purchase collision and comprehensive fire/theft damage insurance and workers' compensation insurance at additional cost, in each case written by such insurance carrier of the Affiliation as the Affiliation shall designate, at such premiums as determined by the Affiliation's insurance carrier from time to time and payable by Licensee, and in such amounts as reasonably requested by Licensee and approved by the Affiliation's insurance carrier.

g.    Licensee shall be eligible to participate in optional loan programs and cab-top or other exterior/interior taxicab advertising programs offered from time to time by Affiliation on such terms as those programs are offered to all members of the Affiliation.

7.    Insurance.

Affiliation agrees to provide public liability and property damage insurance (or equivalent indemnity) covering Affiliation and Licensee in an amount of not less than $350,000 combined single limit (or such higher limits as may be required from time to time by

3

Affiliation or applicable law) and of the types prescribed by ordinances of the City of Chicago and laws of the State of Illinois, as written by the Affiliation's insurance carrier at the time such insurance is obtained, or such equivalent indemnification in a manner authorized by law other than by a policy of liability insurance.

Affiliation will make available to Licensee upon request, at an additional cost to Licensee and subject to availability from the Affiliation's insurance carrier at that time, (i) collision damage insurance and (ii) workers' compensation insurance for Licensee's agent drivers.

8.    Radio Dispatch Equipment Available From Affiliation.

Licensee may request the Affiliation to furnish the radio dispatch equipment required under Paragraph 1.e (ii) above.  If Licensee so requests, Licensee will pay the installation charge specified in the Payment Schedule, and Affiliation will cause its service provider to install in the Licensee's vehicle, subject to availability and at the Affiliation's discretion, such new or used radio dispatch equipment as may be available from the Affiliation's pool of available equipment.  Licensee will document its request and acceptance of the equipment by execution of an Equipment Acceptance And Responsibility Agreement substantially in the form attached hereto as Exhibit B.

9.    Operation of Taxicab in Accordance with Applicable Law.

Licensee agrees to operate or cause the operation of its Taxicabs in accordance with (i) all applicable laws, ordinances and regulations pertaining to the operation of taxicabs as are in effect from time to time in the City of Chicago and the State of Illinois and (ii) the Affiliation's radio protocols in effect from time to time and posted at the Affiliation's various locations.  **In furtherance of the foregoing, Licensee and Affiliation acknowledge their respective responsibilities under Section 9-112-215(d) and 9-112-215(h) of the Municipal Code and agree that it is not only the responsibility of the Licensee, but also the responsibility of the Affiliation, acting as an agent of the Licensee pursuant to this Agreement, to insure that any agent driver of the Licensee's Taxicabs shall, at all times when the Taxicab is operated, keep the radio dispatch equipment activated in such a manner to be clearly audible to the driver and respond to any and all requests for service which the Affiliation may designate to the affiliated Taxicab.**  Licensee shall not permit the operation of its Taxicabs by any person without receiving the prior written approval of Affiliation with respect to such person.  Failure to comply with any of the provisions of this Paragraph 9 may result in the immediate suspension of Licensee's radio privileges hereunder in the sole discretion of the Affiliation and the exercise of any other rights or remedies available to the Affiliation hereunder.

10.    Termination.

Affiliation may, at its sole discretion and upon 35 days prior written notice to Licensee and the City of Chicago Department of Consumer Services, terminate this Agreement upon the occurrence of any one or more of the following:

a.    Licensee is in default under any other obligation or liability due and owing to Affiliation or any lender for which Affiliation acts as collection agent;

b.    The Medallion is revoked by the City of Chicago;

c.    Licensee or any of its agent drivers violates any rule or regulation of the City of Chicago, Department of Consumer Services, or any rule or radio protocol adopted from time to time by the Affiliation relating to compliance by the Affiliation or its members with all laws, rules and regulations applicable to the Affiliation or its members;

d.    Licensee or its agent driver shall, at any time during the term hereof, fail to comply with any of the provisions of this Agreement;

e.    Licensee or its agent drivers cease being insured or insurable by the Affiliation's insurance carrier as provided in Paragraph 7 hereof;

f.    Licensee or its agent driver: (i) fails to notify Affiliation, the Affiliation's insurance carrier or such other agent of Affiliation designated to receive Licensee's notice from time to time, of any accident involving Licensee and one of its Taxicabs within one (1) hour following the occurrence of such accident, or (ii) causes or is a party to any accident where its driver's ability to drive safely is called into question, such determination to be made at Affiliation's sole discretion;

4

g.   Licensee assigns, sells or otherwise transfers the Medallion and/or its rights hereunder without the express written approval of the Commissioner of Consumer Affairs as to the Medallion transfer and the Affiliation as to its rights under this agreement;

h.   Licensee fails to pay any of the fees due and owing pursuant to Paragraph 3 or Paragraph 6 hereof within 5 days after such fees are payable;

i.   Licensee (i) is convicted of any misdemeanor or felony or (ii) performs any acts or omissions that will bring discredit to Affiliation or its reputation;

j.   Licensee permits the operation of the Taxicab by another person in violation of Paragraph 1 (f), Paragraph 1 (h), or Paragraph 9 of this Agreement;

k.   Licensee's agent driver provides any false information on a Personal Resume;

l.   Licensee does not maintain the standards of services or quality in connection with its Taxicab at least equivalent to those adopted or used by Affiliation with respect to the Colors or Insignia; or

m.   Licensee shall fail to respond to written notices and telephone inquiries from the Affiliation within 48 hours after delivery of such communications to Licensee.

Upon termination or expiration of this Agreement, Licensee shall, within five (5) days after termination, pay all amounts due and owing to Affiliation under this Agreement and shall immediately remove all Insignia and decals of the Affiliation from the Taxicab and repaint his or her Taxicab as provided in Paragraph 4 hereof (and Licensee shall not use such vehicle as a taxicab until the completion of such repaint).

In addition to the foregoing, upon the termination of this Agreement by Affiliation pursuant to the violation by Licensee and/or his agent driver of any of the provisions set forth in this Paragraph 10, Affiliation shall be entitled at its election to (x) receive the amount of any security deposit it is holding as liquidated damages or, if applicable, the amount set forth in any liquidated damages rider attached hereto and executed by the parties, (y) accelerate and receive in a lump sum payment the amount of all remaining fees which Affiliation would have been entitled to receive under Paragraph 3 hereof for the remainder of the stated term hereof had this Agreement not been so earlier terminated and/or (z) pursue any right, remedy or action that Affiliation may have against Licensee at law or in equity for Licensee's breach of this Agreement. Notwithstanding the foregoing election, the Affiliation shall in any event be entitled to all costs and expenses (including reasonable attorneys' fees and disbursements and collection agency fees, court costs and repossession expenses) incurred by the Affiliation as a result of Licensee's default hereunder and the Affiliation's exercise of its remedies with respect thereto. Licensee acknowledges and agrees that the security deposit held by the Affiliation may be applied toward the payment of all amounts due and owing to the Affiliation under this Agreement.

11.   <u>Assignment and Transfer by Licensee.</u>

If Licensee sells or otherwise transfers the Medallion in accordance with applicable law, Affiliation shall release Licensee from its obligations under this Agreement, provided that the following conditions have been met:

a.   Licensee shall not be in default hereunder or in any obligation to Affiliation;

b.   Licensee shall have assigned to the transferee ("Buyer") its rights under this Agreement and Affiliation shall have consented in writing to the assignment. In determining whether to withhold or grant such consent, Affiliation will consider such factors as Affiliation, in its sole discretion, deems reasonable and appropriate, including, without limitation, criteria and conditions then applicable to new operators. If a dispute arises as to Buyer's qualifications, Affiliation's evaluation shall govern, provided it has conducted and arrived at such evaluation in good faith; and

c.   Buyer shall have executed and delivered to the Affiliation (at Affiliation's option) either (i) an agreement by which it personally assumes full and unconditional liability for and agrees to perform from the date of such transfer all obligations, covenants, and agreements contained in this Agreement to the same extent as if it had been an original party

5

to this Agreement; or (ii) a new affiliation agreement (in the form then being used by Affiliation containing the then current price and terms being offered to new operators) together with any deposits and other sums of money required thereby.

12.    Indemnification.

Licensee covenants and agrees to protect, indemnify and hold harmless Affiliation, its officers, directors and employees, affiliates and their successors and assigns from and against any and all costs, expenses, losses, damages and liabilities (including reasonable attorneys, paralegal and accountants' fees), incurred or claimed because of any act, omission or neglect by Licensee or any of his agents, servants, employees or guests or which arises from, in connection with or as a result of Licensee's Taxicab ownership or operations. In the event that Affiliation is named as a defendant in any legal action, lawsuit or claim with respect to which Affiliation is to be indemnified hereunder, Affiliation may elect to be represented by legal counsel of its choice, whereupon Licensee shall reimburse Affiliation on a monthly basis for the legal expenses that Affiliation incurs in defending any such matters. The provisions of this Paragraph 12 shall survive the termination or expiration of this Agreement.

13.    Miscellaneous.

a.    Notices.

Any notice hereunder must be in writing and will be deemed to have been given when hand delivered or sent by overnight delivery service or three (3) days after being sent by registered or certified mail, postage prepaid, addressed to the parties at their respective addresses as set forth on Page 1 of this Agreement or to such other address as shall be furnished in writing by the parties in accordance with this Paragraph.

b.    Governing Law; Successors; Amendments.

This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois, shall inure to the benefit of and shall be binding upon the parties hereto, their legal representatives, heirs, successors and permitted assigns, and may not be amended or modified except in writing by a document executed in the same manner as this Agreement.

c.    Entire Agreement.

All agreements, undertakings, representations and warranties between the parties hereto with respect to the subject matter of this Agreement are set forth herein, and no other agreements, undertakings, representations or warranties exist.

d.    Representation by Counsel.

The parties acknowledge that each has been represented by counsel of its choice in connection with the transaction contemplated hereby.

e.    Status as Independent Contractors.

Each party hereto acknowledges that it is an independent contractor and affirms that nothing contained herein shall be construed as creating any employer-employee, principal-agent, partnership, or joint venture relationship between the parties; provided, however, that the foregoing shall not be construed as to limit the respective obligations of the parties regarding the dispatch of taxicabs as set forth in the City of Chicago Municipal Code and Paragraph 9 hereof.

f.    Waiver.

Failure or repeated failure of Affiliation to enforce any of the provisions of this Agreement shall not constitute a waiver of rights or a waiver of any subsequent enforcement of the provision of this Agreement.

6

g.    <u>Severability.</u>

If any nonmaterial provision of this Agreement is found to be unlawful or unreasonable and unenforceable by any court of competent jurisdiction, such act shall not affect the validity of this Agreement, which shall remain in full force and effect, and such provision shall be modified to the extent necessary to cause such provision to be reasonable and binding upon the parties hereto.  In the event any material provision of this Agreement is declared invalid or is otherwise enforceable, the parties shall negotiate in good faith to substitute such provision with a lawful provision; and if the parties are unable to reach agreement within a reasonable period of time, Affiliation may elect to terminate this Agreement upon notice to Licensee.  For purposes of this Paragraph, a provision shall be deemed material if its invalidity (in whole or in part) in any way alters or causes the alteration of the relationship of the parties or fees owed hereunder.

h.    <u>Assignment by Affiliation.</u>

This Agreement and any and all rights of Affiliation hereunder may be assigned and transferred by Affiliation, in whole or in part, and shall inure to the benefit of Licensee's successors and assigns.  Any such assignment or transfer shall require the assignee to fulfill Affiliation's obligations under this Agreement.

i.    <u>Termination or Assignment by Licensee.</u>

Except as provided in Paragraphs 2 and 11 hereof, Licensee shall not have the right to terminate or assign this Agreement.  Should Licensee terminate or assign this Agreement in violation of this subparagraph, then Affiliation may elect to receive as liquidated damages the amount set forth in Paragraph 10 hereof, or to pursue any right, remedy or action that Affiliation may have against Licensee at law or in equity for breach of contract.  Such election shall be made by written notice to Licensee.

j.    <u>Terminology.</u>

All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number and any other gender as the context of this Agreement requires.

k.    <u>Jurisdiction.</u>

Licensee consents and agrees that the state or federal courts located in Cook County, City of Chicago, State of Illinois, shall have exclusive jurisdiction to hear and determine any claims or disputes between or among any of the parties hereto pertaining to this Agreement or any other instrument, document or agreement executed or delivered in connection herewith or therewith, and any investigation, litigation, or proceeding related to or arising out of any such matters, <u>provided</u>, that Licensee acknowledges that any appeals from those courts may have to be heard by a court located outside of such jurisdiction.  Licensee expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and hereby waives any objection that Licensee may have based upon lack of personal jurisdiction, improper venue or inconvenient forum.

l.    <u>Jury Trial Waiver.</u>

**The Licensee and Affiliation acknowledge that commercial disputes are most efficiently resolved by persons experienced in the resolution of such disputes.  Therefore the Licensee and the Affiliation waive trial by jury with respect to any dispute pertaining to this Agreement and agree that any such dispute shall be tried by a judge.**

[Signature page follows]

7

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement in Chicago, Illinois, _____, 20___.

AFFILIATION:

YELLOW CAB AFFILIATION, INC.


By:_____

Name:_____

Title:_____

LICENSEE:

_____
(an Illinois: ___Corporation ___LLC ___Individual)

By:_____*

Name:_____

Title:_____

Medallion #(s) _____

Expiration Date:  December 31, 20___

Address for Notice Purposes:

_____

_____


*If signed by a licensed manager on behalf of Licensee please provide details below as well as a copy of the medallion management agreement currently in effect.

Manager Name:

_____
(an Illinois: ___Corporation ___LLC ___Individual)

Address:

_____

_____


Date of Management Contract:  _____

Term of Contract:  _____

8

## YELLOW CAB AFFILIATION, INC.
## TAXICAB AFFILIATION AGREEMENT

### Schedule Of Current Charges
(Effective January 1, 2010)
(Subject to Adjustment)

$       Weekly Affiliation Fee:
- If Licensee is an Individual without Agent Drivers                  $_____ per week
- If Licensee is an Individual/Entity with Agent Drivers
  (Includes workers' compensation insurance)                  $_____ per week

$       Refundable Security Deposit (Bond)                    $_____ one time deposit

$       Collision                                                              damage
insurance                                                                         TBD*


- Radio equipment installation charge                    As    posted    at    Affiliation's
  installation facility

* To be determined pursuant to insurance rates in effect at time of election.

_____

9

<u>EXHIBIT B</u>

<u>YELLOW EQUIPMENT ACCEPTANCE AND RESPONSIBILITY AGREEMENT</u>

THIS AGREEMENT (the "Agreement") is made as of the date set forth below between the person identified as "Licensee" on the signature page hereof, whose address is set forth thereon ("Licensee"), and YELLOW CAB AFFILIATION, INC., an Illinois corporation, whose address is 3351 W. Addison, Chicago, Illinois 60618 ("Affiliation").

W I T N E S S E T H :

WHEREAS, Licensee and Affiliation are parties to a Taxicab Affiliation Agreement (the "Affiliation Agreement") under which Affiliation has agreed to provide to Licensee, among other benefits, access to a radio dispatch system utilizing such equipment as may be required from time to time by the Affiliation and which equipment is to be supplied by Licensee or, at Licensee's request, by the Affiliation; and,

WHEREAS, Licensee has requested, pursuant to paragraph 8 of the Affiliation Agreement, that the Affiliation provide the necessary radio equipment to implement said dispatch system.

NOW, THEREFORE, the parties hereto hereby agree as follows:

**1. Equipment:**

    a.    Affiliation agrees to provide to the Licensee during the term of the Affiliation Agreement (subject to paragraph 2.b below) the use of the radio equipment (the "Equipment") described as follows:

        (i)    One 2-way dispatch radio, serial # _____;

        (ii)    A <u>Gandalf</u> dispatch radio system comprised of a mobile data terminal unit (serial # _____), key pad

            (serial # _____) and display (serial # _____); and

        (iii)    all necessary accessories including, but not limited to, an antenna and microphone to be issued and installed by a service provider and at a location designated by the Affiliation.

    b.    Affiliation also agrees to provide routine maintenance of the Equipment, provided that the Equipment has not been abused, neglected, or damaged, normal wear and tear excepted.

**2. Covenants of Licensee:**  Licensee hereby agrees to the following conditions:

    a.    Licensee accepts the Equipment in good working order.

    b.    Licensee understands that Equipment remains the sole property of the Affiliation and must be returned immediately (within 48 hours) to the service provider and at the location designated by the Affiliation, upon request of the Affiliation or upon termination of the corresponding Yellow Taxicab Affiliation Agreement.

    c.    Licensee agrees to have all maintenance and repairs of the Equipment performed only at facilities designated by the Affiliation.

    d.    Licensee further accepts that Licensee is fully responsible for the condition of the described equipment, normal wear and tear excepted, while that Equipment is in the possession of the Licensee and until its return to the Affiliation.

    e.    Repairs and replacement due to theft, abuse, neglect, and/or damage incurred other than normal wear and tear, whether caused by the Licensee, its agent driver, or anyone else, shall be paid for by the Licensee.

    f.    Licensee may not tamper with, alter, sell, lease, assign, or lend any item of Equipment.

    g.    Licensee agrees that the Equipment will be solely used in the vehicle registered with the Affiliation for the medallion number indicated below, by the Licensee only, and/or those agent drivers authorized by the Affiliation.

    h.    Licensee further agrees to abide by all laws and regulations regarding the operation of said Equipment including, but not limited to, rules of operation posted by the Affiliation. Violation of said rules may result in the suspension and/or

forfeiture of the use of the Equipment and require its immediate return.

**3.  Governing Law; Successors; Amendments.**     This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois, shall inure to the benefit of and shall be binding upon the parties hereto, their legal representatives, heirs, successors and permitted assigns, and may not be amended or modified except in writing by a document executed in the same manner as this Agreement.

**4.  Severability:**  If any provision of this Agreement is found to be unlawful or unreasonable and unenforceable by any court of competent jurisdiction, such act shall not affect the validity of this Agreement, which shall remain in full force and effect, and such provision shall be modified to the extent necessary to cause such provision to be enforceable and binding upon the parties hereto.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement in Chicago, Illinois, on _____, 20__.

AFFILIATION:

YELLOW CAB AFFILIATION, INC.

LICENSEE:

_____
(an Illinois: ___Corporation ___LLC ___Individual)

By:_____

Name:_____

Title:_____

By:_____

Name:_____

Title:_____

Medallion #:_____

Address:

_____

_____

11



[Yellow]

# SERVICES AGREEMENT

THIS SERVICES AGREEMENT is made as of January 1, 2010 (the "Agreement"), by and between TAXI AFFILIATION SERVICES LLC., a Delaware limited liability company (the "TAS") and YELLOW CAB AFFILIATION, INC., an Illinois corporation (the "Association").

## Recitals

WHEREAS, TAS is in the business of providing back-office accounting, cashiering and other taxicab related services to taxicab affiliations in the City of Chicago.

WHEREAS, the Association is a taxicab affiliation in the City of Chicago whose members provide taxicab service to the general public in the City of Chicago.

WHEREAS, the Association requires and TAS, either directly or through one or more other service providers designated by TAS (collectively with TAS, the "Service Provider"), is willing to provide certain services, programs, systems, and assistance in connection with the Association's operations.

NOW, THEREFORE, in consideration of the promises set forth in this Agreement and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Association and the Service Provider agree as follows:

1.  **Services**.

    (a)    The Service Provider shall make available such personnel and systems as may be necessary to assist the Association in performing the following operations:

    (i)    Accounting and back-office functions.

    (ii)    Cashiering and collection functions for the demand, collection, and receipt of any and all affiliation fees, charges or other revenues payable to the Association.

    (iii)    Maintenance of customary books, records and accounts of all costs and expenses incurred and all income and receipts received in connection with the foregoing.

    (iv)    IT support and service.

(v)     Performance of such other administrative business functions in connection with the business and affairs of the Association as the Association may from time to time reasonably request of the Service Provider.

(b)     Service Provider shall also provide to the Association, and the Association may utilize and otherwise make available to its members, each of the following services and programs on terms and conditions to be agreed upon:

(i)     Cashier window services.

(ii)    Purchasing programs for the supply of radio and communications equipment.

(iii)   Assistance with securing rooftop and similar taxicab related advertising programs, when available.

(iv)    Assistance with securing insurance programs, when available.

(v)     Assistance with securing loan programs, when available.

(vi)    Such other services and programs typically offered by Service Provider to other taxicab affiliations and requested by the Association.

(c)     Service Provider shall assist the Association with advertising, marketing and promotions, and hereby grants to the Association the right and license to use during the term hereof (i) the "Yellow Cab" trade name, service mark and related trade dress and logos in connection with the Association's taxicab business and (ii) the telephone number "312-Taxicab" and all "Yellow Cab" internet domain names and web addresses.

(d)     Any one or more of the services set forth in this Section 1 may from time to time be rendered at the Service Provider's offices or at such other location selected by the Service Provider and/or the Association.

2.     **Fees and Expenses.**

(a)     The Association agrees to pay the Service Provider (or its designee) a monthly fee (the "Fee"), determined in part by the number of Affiliation Members in the Association, as per the fee schedule annexed hereto as Exhibit A.

(b)     The Association agrees to pay and reimburse the Service Provider (or its designee) actual and direct out-of-pocket expenses (including fees and disbursements of attorneys, accountants and other professionals retained by the Service Provider in connection

2

with the services provided hereunder) incurred by the Service Provider and its personnel in performing services hereunder to the Association and its subsidiaries.  In addition, the Service Provider shall be reimbursed by the Association for all direct costs it incurs on behalf of the Association for any selling, general and administrative costs (including accounting, bookkeeping, executive management, travel, telephone, data processing, and other overhead expenses) reasonably allocated by the Service Provider to services provided or performed on behalf of the Association.  Any such reimbursement shall be payable by the Association promptly on the Service Provider's rendering of a statement therefor, together with such supporting data as the Association reasonably shall require.

3.   **Term**.

This Agreement shall be for a term of one (1) year and shall expire on December 31, 2010;  provided, however, that this Agreement shall thereafter be automatically renewed for successive one-year terms unless either party, within sixty (60) days prior to the scheduled renewal date, notifies the other party as to its termination of this Agreement.

4.   **Limitation of Liability: Indemnity**.

The Association covenants and agrees to protect, indemnify and hold harmless the Service Provider, its directors, officers, and employees, affiliates and their successors and assigns (collectively, the "Indemnified Persons"), from and against any and all costs, expenses,  losses, claims, damages, and liabilities ( including reasonable attorneys' and accountant fees) incurred or claimed because of any act, omission or neglect by the Association or any of its affiliates, agents, servants, employees or guests or which arises from, in connection with or as a result of the Association's taxicab, affiliation or other operations; provided, however, such indemnity shall not apply to any such cost, expense, loss, claim, damage, or liability to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of the Service Provider, as admitted in any settlement of such Indemnified Person(s) or held in any final, non-appealable judicial or administrative decision.  In the event that the Service Provider is named as a defendant in any legal action, lawsuit or claim with respect to which Service Provider is to be indemnified hereunder, the Service Provider will have the right to retain counsel of its own choice to represent it and/or the Indemnified Persons, which will conduct the defense of such claim, and the Association will pay the reasonable fees and expense of such counsel on a monthly basis.  Neither termination nor completion of this Agreement shall affect these indemnification provisions which shall remain operative and in full force and effect.

5.   **Miscellaneous**.

(a)   This Agreement sets forth the entire understanding of the parties with respect to the Service Provider's rendering of services to the Association and supersedes any and all prior services and/or consulting agreements between the parties.

3

(b)     This Agreement or any provision hereof may not be modified, waived, terminated or amended except expressly by an instrument in writing signed by the Service Provider and the Association.

(c)     This Agreement may not be assigned by either party without the consent of the other party but shall be binding upon and inure to the benefit of the parties and their respect successors, assigns and heirs.

(d)     In the event that any provision of this Agreement shall be held to be void or unenforceable, in whole or in part, the remaining provisions of this Agreement and the remaining portion of any provision held void or unenforceable inpart shall continue in full force and effect.

(e)     Except as otherwise specifically provided herein, notice given hereunder shall be deemed sufficient if delivered personally or sent by registered or certified mail to the address of the party for whom intended at the principal executive offices of such party, or at such other address as such party may hereafter specify by written notice to the other party.

(f)     No waiver by either party of any breach of any provision of this Agreement shall be deemed a continuing waiver or a waiver of any preceding or succeeding breach of such provision or of any other provision herein contained.

(g)     The Service Provider and its personnel shall, for purposes of this Agreement, be independent contractors (and not agents or representatives) with respect to the Association.

(h)     This Agreement shall be governed by the laws of the State of Illinois.

4

IN WITNESS WHEREOF, the parties hereto have duly executed this Services Agreement as of the date and year first above written.

YELLOW CAB AFFILIATION, INC.

By: _____

Name: DANIEL R. DELEO

Title: PRES.

TAXI AFFILIATION SERVICES LLC

By: _____

Name: Timothy M. Murphy

Title:

5

EXHIBIT "A"

Fees to be Paid

(i)      a base fee of $2,500 per month for the services provided hereunder.

(ii)     for each month that the Association has in excess of twenty (20) affiliate members, then with respect to each such affiliate member in excess of twenty (20), an additional fee of $45.00 per affiliate member per week (based on the average number of affiliate members in the Association for each respective month), subject to reconciliation and adjustment within ninety (90) days after the end of each year to reimburse Service Provider for the expenses described in Section 2(b).

The foregoing fees shall be paid in arrears within ten (10) days after the end of the calendar month in question.

C:\Users\astateman\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\H5QNU2LO\AffiliationServiceAgt-Taxi
Affil-Yellow.doc

6

[8.14.3] [TAS-Yellow Services Agmt 010110.pdf] [Page 6 of 6]

**List of Entities in Yellow Group**

Yellow Group LLC

Yellow Services Inc.

Wolley Cab Association Inc. (d/b/a Checker Taxi Affiliation Inc.)

Yellow Cab Affiliation Inc.

Blue Diamond Taxi Association Inc.

Taxi Affiliation Services Inc.

Taxi Works LLC

Taxi Vehicle Leasing LLC

Taxi Medallion Management LLC

TMM 1 LLC

TMM 2 LLC

TMM 3 LLC

TMM 4 LLC

TMM 5 LLC

TMM 6 LLC

TMM 7 LLC

TMM 8 LLC

TMM 9 LLC

TMM 10 LLC

Metro Yellow North Chicago LLC

Metro Yellow LLC (d/b/a Purple Cab)

Metro Cabs 1, LLC

Metro Yellow Northwest LLC

Metro Checker Waukegan LLC

Metro Yellow Waukegan LLC

Metro Lake County Transportation LLC

Metro Yellow Gurnee LLC

Dimension Media Group (CL) LLC

Mobigosee LLC (inactive corporation)

**List of Known Related Parties to the Yellow Group**

| | |
|---|---|
| People Mover Inc. | YC 14 LLC |
| Yellow Cab Partners Inc. | YC 15 LLC |
| American United Taxi Affiliation LLC | YC 16 LLC |
| Transit Financial LLC | YC 17 LLC |
| Gemini Claim Management LLC | YC 18 LLC |
| American Resources Insurance Agency LLC | YC 19 LLC |
| Transit General Insurance Company | YC 20 LLC |
| Transit Fuel Holdings LLC | YC 21 LLC |
| Winners Edge Marathon | YC 22 LLC |
| Winners Edge Fuel Services LLC | YC 23 LLC |
| Transit Funding Group, Inc. | YC 24 LLC |
| Transit Funding Group LLC | YC 25 LLC |
| Transit Funding Associates LLC | YC 26 LLC |
| Transit Funding Associates 2 LLC | YC 27 LLC |
| Transit Funding Associates 3 LLC | YC 28 LLC |
| Transit Funding Associates 4 LLC | YC 29 LLC |
| Transit Funding Associates 5 LLC | YC 30 LLC |
| Transit Funding Associates 6 LLC | YC 31 LLC |
| Yellow Medallion Holdings LL | YC 32 LLC |
| YC 1 LLC | YC 33 LLC |
| YC 2 LLC | YC 34 LLC |
| YC 3 LLC | YC 35 LLC |
| YC 4 LLC | YC 36 LLC |
| YC 5 LLC | YC 37 LLC |
| YC 6 LLC | YC 38 LLC |
| YC 7 LLC | YC 39 LLC |
| YC 8 LLC | YC 40 LLC |
| YC 9 LLC | YC 41 LLC |
| YC 10 LLC | YC 42 LLC |
| YC 11 LLC | YC 43 LLC |
| YC 12 LLC | YC 44 LLC |
| YC 13 LLC | YC 45 LLC |

YC 46 LLC

CLMH 3, LLC

YC 47 LLC

CLMH 4, LLC

YC 48 LLC

CLMH 5, LLC

YC 49 LLC

CLMH 6, LLC

YC 50 LLC

CLMH 7, LLC

YC 51 LLC

CLMH 8, LLC

YC 52 LLC

CLMH 9, LLC

YC 53 LLC

CLMH 10, LLC

YC 54 LLC

CLMH 11, LLC

YC 55 LLC

CLMH 12, LLC

YC 56 LLC

CLMH 13, LLC

YC 57 LLC

CLMH 14, LLC

YC 58 LLC

CLMH 15, LLC

YC 59 LLC

CLMH 16, LLC

YC 60 LLC

CLMH 17, LLC

YC 61 LLC

CLMH 18, LLC

YC 62 LLC

CLMH 19, LLC

YC 63 LLC

CLMH 20, LLC

YC 64 LLC

CLMH 21, LLC

YC 65 LLC

CLMH 22, LLC

YC 66 LLC

CLMH 23, LLC

YC 67 LLC

CLMH 24, LLC

YC 68 LLC

CLMH 25, LLC

YC 69 LLC

CLMH 26, LLC

YC 70 LLC

CLMH 27, LLC

YC 71 LLC

CLMH 28, LLC

YC 72 LLC

CLMH 29, LLC

YC 73 LLC

CLMH 30, LLC

YC 74 LLC

YC 75 LLC

CL Medallion Holdings LLC

*Excludes any entities owned or controlled by*

CLMH 1, LLC

*Michael Levine or Patton Corrigan that appear*
*unlikely to be related to the Chicago taxicab*

CLMH 2, LLC

*industry*